UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Ernestine Wingate as the Personal Representative of the Estate of Ernest Russell, | ) ) ) | Civil Action No. 4:13-cv-03343-BHH-KDW |
| | ) | |
| Plaintiff, | ) ) | REPORT AND RECOMMENDATION |
| vs. | ) ) ) | (Defendant Ben Weatherford's Motion for Summary Judgment, ECF No. 59) |
| Wayne Byrd, both individually and in his Official capacity as the Sheriff of Darlington County; Darlington County Sheriff's Office; The County of Darlington; The City of Darlington Police Department; The City of Darlington; Ben Weatherford; Clyde M Shepherd; And John Does 1-10 | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

Plaintiff, as personal representative of the Estate of Ernest Russell ("Russell"), filed this 42 U.S.C. § 1983 action alleging Defendants violated Russell's Fourth and Fourteenth Amendment rights during the execution of a search warrant that resulted in Russell's death. Plaintiff also brought South Carolina state law claims against Defendants. Presently before the court is Defendant Weatherford's Motion for Summary Judgment filed on January 12, 2016. ECF No. 59. Additionally, summary judgment motions by Defendants City of Darlington, Darlington Police Department, and Clyde M. Sheppard,[1] ECF No. 63; and Defendants Wayne Byrd, Darlington County Sheriff's Office, and the County of Darlington, ECF No. 64; are pending before the court. This Report and Recommendation ("R&R") addresses only Defendant Weatherford's Motion, ECF No. 59. Plaintiff collectively responded to the pending Motions on

---

[1] Though Plaintiff spells Officer Shepherd as indicated in the above caption to this case, it appears that the correct spelling is "Sheppard," and the undersigned will spell his name accordingly herein.

February 16, 2016. ECF No. 76.[2] Only Defendant Weatherford submitted a Reply. ECF No. 80. All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Civil Rule 73.02(B)(2)(d) and (f) (D.S.C.). Because these Motions are potentially dispositive of Plaintiff's claims, this R&R is entered for review by the district judge.

## I.    Background

Plaintiff brought this lawsuit after Russell was shot and killed by Darlington law enforcement officers during the execution of a search warrant for gambling paraphernalia on October 21, 2011. ECF No. 1-1. Defendant Sheppard obtained the search warrant on October 19, 2011, and the warrant indicated that officers were in search of the following: "DCDEU monies, large amounts of U.S. currency, gaming machines, books records, receipts, notes, ledgers, electronic devices and other papers relating to illegal gaming and gaming equipment." ECF No. 60-1 at 3. The warrant indicated that officers intended to search a white building on 1312 S. Main Street in Darlington, SC. *Id.* at 3. In the "reason for affiant's belief that the property sought is on the subject premises," Defendant Sheppard indicated the following:

> Agents of the Darlington County Drug Unit has (sic) been conducting an investigation on a gambling house located at 1312 S. Main Street in the City of Darlington. Several complaints have been received about this location due to illegal gambling. With the use of a confidential informant agents were able to observe through audio and video recording illegal betting and gambleing (sic) on sports games.

*Id.*

---

[2] On August 19, 2016, the undersigned approved a settlement agreement between Plaintiff and former Defendants Robert McIntyre and John Specht. *See* ECF No. 114. The undersigned's approval of the settlement agreement makes these former Defendants' Summary Judgment Motion, ECF No. 65, moot. Plaintiff's Response addresses arguments made in ECF No. 65, and these former Defendants are mentioned throughout this R&R because of their involvement in the execution of the search warrant that led to the filing of this action.

The execution of the warrant was recorded by a chest camera ("chest-cam") worn by Officer Specht. The parties have submitted video footage from this chest-cam in support of their arguments.  The undersigned has reviewed this video evidence, and, based on that review, the following is a description of what can be seen during the execution of the search warrant for the property located at 1312 South Main Street, Darlington, South Carolina on October 21, 2011,[3] ECF Nos. 67, 76-18:

During daylight hours, officers exited a vehicle and approached the side of a white building with two doors. The first door (the right-side door) had a glass or plastic storm door covering a wooden door.  Officers opened the first door, and one officer (now known to be Defendant Weatherford) attempted to twist the inside wooden door's knob but finds it is locked. This officer then walks toward the other side door (the left-side door). At this point in the video, Officer Specht is behind two officers, and the first in line is wearing a vest with "SHERIFF" written across the back. One officer, the second officer (now known to be Officer McIntye), hits the locked wooden door with a battering ram, but the door does not open. This officer has "POLICE" written across the back of his vest. The second officer runs to the left-side door where the first officer is approaching. Based on the count-down clock on the video, this initial entry— the time officers exited the police vehicle to the time the first and second officers entered the left-side door—took approximately 20 seconds.

The first officer (Defendant Weatherford) enters, without knocking, through the left-side door. The video does not depict images from inside the house in the moments immediately following the first officer's entry. Next, the two officers (Officers McIntyre and Specht)

---

[3] Though the execution of the search warrant occurred on October 21, 2011, the bottom right-hand frame of the video incorrectly indicates that the warrant was executed on March 18, 2007 at 21:29 hours.

following the first officer also enter the location through this door. Loud shouting is heard as the second officer enters into the location, and the third officer is immediately behind him. The video depicts a woman (the confidential informant) standing towards the front of the room, and the officers pass her during their entry. More yelling is heard, and several shots are fired. It is unclear from the video who fired the shots or the circumstances leading to the firing of the shots. One officer, with "SHERIFF" written on the front and back of his vest,[4] looked at the camera and said, "he pointed a gun at me." Based on the countdown clock on the video, 46 seconds elapsed between time of both officers' entry until the declaration by the officer (Defendant Weatherford).

After the shooting, the officers re-enter the location, and one officer says, "where's the gun now?" Russell is seen sitting or slumped behind a counter, and there is black gun lying on the counter to the left of where Russell's body is resting. One of the officers then goes outside and re-enters with a camera. Officer Specht then surveys the room and takes several photographs. Five video poker machines are seen lining one of the walls of the room.

In this action, Plaintiff maintains that the officers' search was objectively unreasonable because officers failed to knock and announce their presence prior to their entry into the premises. ECF No. 1-1 at 9-11. Specifically, in the Complaint, Plaintiff alleges that four officers—Defendants Weatherford, McIntyre, Sheppard, and Specht—"arrived at the premises and without warning or notice made a brief attempt to break down the rear door of the premises with a battering ram." *Id.* at 9; ¶ 19. Additionally, Plaintiff alleges that "[a]pproximately one 'strike' or 'blow to the rear door was made when Defendants Weatherford and [Officer]

---

[4] The "SHERIFF" insignia on the front of the vest is in "1-2" letters on the right upper portion of the vest. The "SHERIFF" insignia on the back of the vest is in much larger letters across the back of the vest.

McIntyre ran to the front door, pulled it open and ran through the front door wearing blue jeans, white t-shirts and brown 'bullet-proof' vests." *Id.* ¶ 20. Plaintiff represents that Defendant Weatherford ran through the front entry of the premises with his gun drawn and without knocking and that Officer McIntyre ran through the front entry immediately behind Defendant Weatherford. *Id.* ¶ 21-23. Moreover, Plaintiff alleges: "In less than five and a half (5.5) seconds from the time Defendant Weatherford came running in through the front door unannounced and wearing 'street clothes', Defendants Weatherford and McIntyre fired approximately nine (9) 'point blank' shots at Ernest Russell hitting striking him in the face, neck, and torso and killing him." *Id.* ¶ 24.

Based on the execution of the warrant, Plaintiff maintains that Defendants' failure to knock and announce did not "give the Decedent Ernest Russell a reasonable amount of time to come to the door and comply with a law enforcement request." *Id.* ¶ 28. Additionally, Plaintiff maintains that the officers' use of force was objectively unreasonable. *Id.* ¶ 29. Further, Plaintiff maintains that "[Officer] Specht and [Defendant] Sheppard were integral and active participants in this improper search and seizure [and] both were aware of this improper search and subsequent seizure, they had the ability to stop it and they both failed to do so." *Id.* ¶¶ 30-31.

Plaintiff represents that Defendant Weatherford gave the following sworn and typed statement to SLED:

> I then headed to the front door. I opened the screen door and checked the other door. It was open. As I opened the door I yelled "Sheriff's office search warrant." As I entered, I pulled out my weapon I yelled again "Sheriff's office" I looked at the CI walking away from the counter to my right. The CI had her hands in the air saying something but I don't remember what. I told her to get her hands up and then I went on past her. I then saw a subject bending over behind the counter. I yelled several times "let me see your hands, Sheriff's office, search warrant". I continued to yell "let me see your hands", but he would not show me his hands. He then looked up at me. I looked him in the eye and yelled "Sheriff's office put your hands up." That's when I saw a gun in his right hand. It was a silver/rusty

> color revolver. He then laid the revolver down on the counter and looked at me but never took his hand off of it. I started yelling "put the gun down sheriff's office". He then picked it up and he was leaning on his right elbow with the gun pointing towards me. I yelled several more times, "drop the gun, drop the gun." He then looked right at me and raised the gun towards me. I could see down the barrel I could see every hole in the cylinder. Feeling that my life was in jeopardy, that is when I shot.

*Id.* ¶ 38. Plaintiff alleges Defendant Weatherford's statement was false and was made in an attempt to cover up the unlawful killing. *Id.* ¶ 39. Plaintiff alleges that Defendant McIntyre also gave a similar false statement in an attempt to cover up the unlawful killing. *Id.* ¶ 40. Plaintiff maintains that Judith Kate Green [the confidential informant or "CI"] made a false statement, claiming that Russell fired three times at officers, in an attempt to conspire with and cover up the unlawful shooting of Russell. *Id.* ¶¶ 41-42.

In her first cause of action, Plaintiff brings a § 1983 claim for unlawful search, excessive force, and a violation of due process under 42 U.S.C. § 1983. *Id.* ¶ 46. Plaintiff brings this cause of action against all Defendants and frames it as violations of the Fourth and Fourteenth Amendments. *See id.* Specifically, Plaintiff maintains that Defendants, through their acts and omissions, deprived Russell of the following constitutional rights:

a. The right to be free from unreasonable searches and seizures as secured by the Fourth and Fourteenth Amendments;
b. The right to be free from excessive and unreasonable force in the course of search or seizure as secured by the Fourth and Fourteenth Amendments;
c. The right to be free from the use of unlawful deadly force as secured by the Fourth and Fourteenth Amendments;
d. The right to be free of unlawful, reckless, deliberately indifferent, and conscience shocking deadly and/or excessive force as secured by the Fourteenth Amendment;
e. The right to be free from deprivation of liberty and injury without substantive due process and from state created danger as secured by the Fourteenth Amendment;
f. And in such other particulars as may be learned through discovery.

*Id.* ¶¶ 46-47.

In her second cause of action, Plaintiff brings a § 1983 claim for deliberate indifference against Defendants Byrd, Darlington County Sheriff's Office, and Darlington County. *Id.* ¶¶ 56-57. Specifically, Plaintiff alleges that these Defendants, through their acts and omissions, allowed officers, "pursuant to the following customs, policies, practices, and/or procedures of the Darlington County Sheriff's Office. . . :"

    a. To use or tolerate the use of excessive and/or unjustified force, in particular during the search of residential dwellings;

    b. To create unnecessary danger and risk of serious harm or death, with deliberate indifference, to occupants of residences being searched by law enforcement officers;

    c. To cover-up violations of constitutional rights by failing to properly investigate and/or evaluate officer involved shootings and by ignoring and/or failing to properly and adequately investigate and discipline unconstitutional or unlawful police activity;[5]

    d. To allow, tolerate, and/or encourage a "code of silence" among law enforcement officers and police department personnel, whereby an officer or member of the department does not provide adverse information against a fellow officer or member of the department; and,

    e. To use or tolerate inadequate, deficient, and improper procedures for handling, investigating, and reviewing complaints of officer misconduct, and;

    f. And as may otherwise be learned during discovery in this case.

*Id.* ¶ 57. Further Plaintiff alleges these Defendants "failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline their officers with deliberate indifference to Plaintiffs' constitutional rights. . . ." *Id.* ¶ 58. Plaintiff also maintains that the Defendant officers' "unconstitutional actions and/or omissions . . . were approved, tolerated and/or ratified by policymaking officials for the Darlington county Sheriff's office and Darlington County." *Id.* ¶ 59.

In the fourth cause of action, Plaintiff brings a final § 1983 cause of action for conspiracy as to all state actors. *Id.* ¶¶ 67-68. Additionally, under the fourth cause of action, Plaintiff brings a civil conspiracy cause of action against the non-state actors. *See id.* There, Plaintiff maintains

---

[5] Sub-paragraph "c" in the Complaint is incorrectly labeled subparagraph "d" and the remaining sub-paragraphs are mislabeled.

that Defendants "conspired and entered into express and/or implied agreements, understandings or meetings of the minds among themselves to deprive Plaintiff and Plaintiff's decedent of their rights as well as their Constitutional rights by giving clearly false statements to SLED during their official investigation." *Id.* ¶ 68.

Plaintiff's third, fifth, and sixth causes of action are brought under South Carolina state law. In her third cause of action, Plaintiff brings negligence and gross negligence claims against Defendants Byrd, Darlington County Sheriff's Office, Darlington County, Darlington City Police, and the City of Darlington. *Id.* ¶¶ 64-66. Plaintiff's fifth cause of action is for wrongful death, and Plaintiff's sixth cause of action is a "survivorship action." *Id.* ¶¶ 73-78.

II.     Standard of Review

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary

judgment motion. *Anderson*, 477 U.S. at 251.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion.  *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds*, 490 U.S. 228 (1989).

III.    Analysis

A.    Unlawful Search Claim

1. The Parties' Positions

Initially, Defendant Weatherford argues that Plaintiff has couched her argument as a "violation of 42 USC § 1983," but there is no cause of action for a § 1983 violation. ECF No. 59-1 at 7. Rather, Defendant Weatherford argues that a plaintiff may use § 1983 as a vehicle to pursue a constitutional rights case rather than claim a "violation" of 42 USC § 1983.  *Id.* Additionally, Defendant Weatherford maintains that Defendants were present on the property pursuant to a lawful search warrant, and their manner of entry was proper. *Id.* at 8. Further, Defendant Weatherford argues that the search warrant itself was valid, and Plaintiff conceded this point. *Id.* Defendant Weatherford contends that the portion of the Complaint suggesting Defendants were required to "knock and announce" their presence pursuant to the Fourth Amendment prior to entering the premises is erroneous. *Id.* Rather, Defendant Weatherford argues that the elements of a reasonable execution of a search warrant have developed over time, and the Supreme Court has held that "in a search of a dwelling, reasonableness requires, with some exceptions, that officers announce their presence and wait a reasonable time before entering the dwelling." *Id.* (citing *Wilson v. Arkansas*, 514 U.S. 927 (1995)). Defendant Weatherford contends the emphasis of the *Wilson* opinion relates to a dwelling. *Id.*

Defendant Weatherford also maintains that there are several exceptions to the knock and announce rule that apply in this instance. *Id.* at 9. First, Defendant Weatherford argues that "police may enter a residence without announcing their presence if they have a reasonable suspicion that announcing would be dangerous or futile or would inhibit the investigation, for example, by allowing destruction of evidence." *Id.* (referencing *Richards v. Wisconsin*, 520 U.S. 385 (1997)). Additionally, Defendant Weatherford maintains that the location in question was not a "dwelling" but a "commercial business," and the expectation of privacy for a commercial property owner is lower than a private property owner. *Id.* Furthermore, Defendant Weatherford argues that the officers "made their presence and purpose known to Ernest Russell" in lieu of a "knock." *Id.* Specifically, Defendant Weatherford maintains that the "ram strike to the [right] side of building certainly sufficed to get the occupants' attention." *Id.* at 10. Further, Defendant Weatherford represents that officers complied with the applicable announcement requirements by entering an "unlocked door, with the obvious appearance of police officers, and announcing their identity as 'Sheriff's Office' as they entered." *Id.*

To the extent the officers' actions did not comply with knock-and-announce requirements, Defendant Weatherford argues that the circumstances surrounding the execution of the search warrant "support the officers' decision not to announce their presence from outside the building [because] [t]here was a legitimate concern for the efficacy of the operation, to catch Russell inside the business and in the act of operating the illegal business, and to make a show of arresting the informant in order to shield her from revelation as an informant. . . ." *Id.*

Plaintiff argues that officers chose to ignore the well-known knock-and-announce rule when executing a search warrant involving a non-violent misdemeanor gambling investigation. ECF No. 76 at 2. Specifically, Plaintiff maintains that "Defendants violated Mr. Russell's Fourth

Amendment rights through an unreasonable search by failing to knock and announce their presence before forcibly entering Mr. Russell's residence." *Id.* at 9. Moreover, Plaintiff asserts that "[a] destructive, forcible entry is generally only reasonable if, after provided a knock, announcement, and sufficient time to process the situation, the suspect still refuses entry." *Id.* at 10. Further, Plaintiff argues that none of the knock-and-announce exceptions "justify Defendants' noncompliance." *Id.*

## 2.  Applicable Law and Analysis

The Fourth Amendment's guarantee of the people's right "to be secure in their persons, houses, papers, and effects," protects individuals living in a large number of legal arrangements. U.S. Const. amend. IV. A Fourth Amendment reasonableness standard governs the lawfulness of an entry by state officers executing a search warrant. In the case of *Wilson v. Arkansas*, the Supreme Court held that whether officers "knock and announce" their presence is part of the reasonableness test under the Fourth Amendment. 514 U.S. 927, 929 (1995); *Bonner v. Anderson*, 81 F.3d 472, 474 (4th Cir. 1996) ("The knock and announcement requirement is an element of the Fourth Amendment reasonableness inquiry."). In *Wilson*, the Supreme Court found:  "[W]e have little doubt that the Framers of the Fourth Amendment thought that the method of an officer's entry into a dwelling was among the factors to be considered in assessing the reasonableness of a search or seizure." 514 U.S. at 934. However, the *Wilson* Court emphasized that there is no "rigid" or "inflexible" rule of announcement. *Id.* The *Wilson* Court specifically named the following three exceptions to the "knock-and-announce" rule: 1) "circumstances presenting a threat of physical violence," 2) "cases where a prisoner escapes from [law enforcement] and retreats to his dwelling," 3) circumstances where "evidence would likely be destroyed if advance notice were given." *Id.* at 936.

The Supreme Court analyzed the rule further in the case of *Hudson v. Michigan*, 547 U.S. 586 (2006). The *Hudson* Court held that the one interest protected by the knock-and-announce rule "is the protection of human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident." *Id.* at 594. Additionally, protection of property or "[b]reaking a house (as the old cases typically put it)" is another interest and "gives individuals the opportunity to comply with the law and to avoid the destruction of property occasioned by a forcible entry." *Id.* (internal citations omitted). Finally, the *Hudson* Court reasoned:

> [T]he knock-and-announce rule protects those elements of privacy and dignity that can be destroyed by a sudden entrance. It gives residents the opportunity to prepare themselves for the entry of the police.  The brief interlude between announcement and entry with a warrant may be the opportunity that an individual has to pull on clothes or get out of bed. In other words, it assures the opportunity to collect oneself before answering the door.

*Id.* (internal citations omitted); *see also Bonner*, 81 F.3d at 475 ("The rule is designed to satisfy three purposes: (1) protecting the safety of occupants of a dwelling and the police by reducing violence; (2) preventing the destruction of property; and (3) protecting the privacy of occupants.").

The Supreme Court has also held that there is no bright-line rule concerning the manner in which law enforcement must knock and announce prior to executing the search warrant. *See United States v. Banks*, 540 U.S. 31, 35–36 (2003) ("Although the notion of reasonable execution must therefore be fleshed out, we have done that case by case, largely avoiding categories and protocols for searches."); *Ohio v. Robinette,* 519 U.S. 33, 39 (1996) ("[W]e have consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry"). Rather, the court instructed that each case, and the reasonableness of the officers' actions must be determined on a case-by-case basis. *See Banks*, 540 U.S. at 36

("[W]e have treated reasonableness as a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of circumstances in a given case; it is too hard to invent categories without giving short shrift to details that turn out to be important in a given instance, and without inflating marginal ones."). Therefore, absent exigent circumstances, the Fourth Amendment requires law enforcement officers to knock and announce their presence when executing a search warrant. Based on these instructions, the Fourth Circuit "requires a court to analyze the facts of each case to determine that the officers had some particularized basis for their suspicion." *United States v. Dunnock*, 295 F.3d 431, 434 (4th Cir. 2002).

a.      Standing/Russell's Expectation of Privacy

Whether the officers were required to knock and announce their presence prior to entering the location depends on Russell's legitimate expectation of privacy at the location where the shooting occurred. Defendant Weatherford argues that Russell's expectation of privacy was lower than a homeowner's because the location in question was commercial property. ECF No. 59-1 at 9. Additionally, Defendant Weatherford argues that exigent circumstances existed that authorized officers to enter the premises without knocking and announcing. *Id.* at 10. After careful consideration, the undersigned finds that questions of fact remain concerning whether Russell had a legitimate expectation of privacy in the location where this shooting occurred. However, this expectation of privacy does not necessarily hinge on whether the location in question was his residence or a commercial establishment. Ultimately, Russell's level of expectation of privacy is a legal question concerning whether he had standing to assert Fourth Amendment rights in this matter, and whether law enforcement was required to knock and announce their presence prior to entering the location.

i)        Dwelling or Residence of Decedent

Here, Defendant Weatherford's argument concerns how to define "dwelling" as well as the "privacy and sanctity associated with a 'dwelling.'" ECF No. 59-1 at 8. Specifically, Defendant Weatherford maintains that "dwelling" is synonymous with "dwelling house." *Id.* Defendant Weatherford maintains that the "[l]ocation in question in this action was not a dwelling, but a commercial business." *Id.* at 9. Initially, in her Response, Plaintiff does not appear to argue against Defendant Weatherford's assertion that the location in question was a commercial business. *See* ECF No. 76 at 10. Rather, Plaintiff argues "in every search warrant execution, the means by which an officer attempts entry is one of the factors determining reasonableness and, absent exigent circumstances, an unannounced entry violates an occupant's Fourth Amendment rights." *Id.* at 11 (citing *Wilson*, 514 U.S. at 934).

However, elsewhere in her responsive brief, Plaintiff maintains that "[i]t would be perfectly reasonable to refer to Mr. Russell's premises as a dwelling because that it how independent state actors and the State of South Carolina referred to the building." ECF No. 76 at 17. In support of this assertion, Plaintiff cites to the autopsy report where the pathologist indicated that Russell's place of death was his "residence." *Id.* Additionally, Plaintiff cites to Russell's death certificate, a document maintained by the South Carolina Department of Health and Environmental Control, that indicates Russell's place of death was "Decedent's home." *Id.* Plaintiff also cites to a portion on her own deposition testimony where she testified that the location "was owned by the Housing Authority of Darlington County ("HADC"). *Id.* Plaintiff cites to the mission of HADC and argues that "these governmental Defendants are all charged with actual knowledge this edifice was 'housing', and not a business open to the public." *Id.* at

17-18. Finally, Plaintiff represents that Officer Sheppard referred to the location as "the residence" in a statement. *Id.* at 18.

As the Fourth Circuit Court of Appeals held in the case of *Bonner v. Anderson*, Fourth Amendment rights are personal. 81 F.3d at 475 (referencing *Alderman v. United States*, 394 U.S. 165, 174 (1969) ("We adhere to these cases and to the general rule that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted."); *see also State v. Wood*, 536 A.2d 902, 905 (Vt. 1987) ("[T]he inquiry into a defendant's capacity to raise a Fourth Amendment challenge was viewed as a collateral question of standing."). The *Bonner* Court noted the Supreme Court has held:  "[C]apacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Id.* (citing *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). "A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as 'reasonable.'" *Minnesota v. Olson*, 495 U.S. 91, 95–96 (1990) (internal citations omitted). The *Rakas* case established the "legitimate expectation of privacy" test, and held that the privacy interest must be demonstrated through:

> a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others, and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude.

439 U.S. at 143 n.12 (citation omitted). While the ability to raise a Fourth Amendment challenge does not necessarily depend on an actual property interest, according to this pronouncement in *Rakas*, a defendant challenging a search must exhibit an interest in the area searched

demonstrably greater than that which would have been sufficient under the previous test of whether the defendant was "legitimately on the premises."

In the facts section of her Brief, Plaintiff describes the location in question as "Mr. Russell's residence." ECF No. 76 at 3. Plaintiff appears to be asserting that based on the contents inside the location, the facility was more akin to a residence than a commercial building. *See id.* Specifically, Plaintiff indicates:

> The surveillance of Mr. Russell's residence showed a single-story white edifice in close proximity to several other dwellings. Exterior Photo, attached as EXHIBIT 4. There was no business sign or posted hours of operation or anything whatsoever to convey in any way that the premises were open to the public. The only signs on the residence's exterior were three prominent "No Trespassing" signs, one on the front of the building and two others near the front door. Exterior Photo 2, attached as EXHIBIT 5. Interior photos depict household appliances (microwave and refrigerator), Mr. Russell's family photos, a child's hand-drawn school project, and a pool table covered with pots and pans. Interior Photos, attached as EXHIBIT 6. The contents were more consistent with a storage facility or "man cave" rather than a commercial business. K. Katsaris Dep. 77:8-18, attached as EXHIBIT 7.

*Id.*

Based on undisputed evidence before the court, the undersigned finds that the location in question was not Russell's residence. According to the latest deed to the property located at 1312 South Main Street, Darlington, South Carolina, which Defendant Weatherford attached as an exhibit to his Reply, R&R Properties Management Services, Inc., granted the property to AHJ Properties, Inc. in 2004. *See* ECF No. 80-1. As demonstrated through deposition testimony, Plaintiff testified that Russell was "a resident of 208 Avenue B in Darlington" at the time of his death and had lived there for "[p]ossibly five years." ECF No. 80-2 at 2. Additionally, Plaintiff testified that Russell had previously lived at a South Main Street address, but not the address where he died. *Id.* at 2-3. Furthermore, Russell's last known drivers' license shows an address of 208 B Avenue, Darlington, South Carolina. ECF No. 80-3. Defendant Weatherford also attached

Russell's license plate information that shows the vehicle registered to him listed the address as 208 B Avenue, Darlington, South Carolina. ECF No. 80-4. Additionally, a recent arrest warrant shows Russell's address as 208 Avenue B, Darlington, South Carolina. ECF No. 80-5. Russell's voter registration addresses indicated that he "registered to vote under the addresses 213 Cross Street and 208 B Avenue, both in Darlington, South Carolina, but no South Main Street address." Aff. of Patti Jeffcoat, ECF No. 80-6.

The undersigned finds that Plaintiff's description of the contents of the location in question does not qualify the location as Plaintiff's residence. Moreover, Plaintiff's attempt to label the location as a man cave or storage facility does not qualify the location as Russell's residence either. Furthermore, the description from third parties indicating that the location was Russell's residence offer no weight to the court because—unlike Plaintiff who is Russell's sister— these parties did not have personal knowledge concerning where Russell was living when he died. Therefore, the undersigned finds that Russell did not have a legitimate expectation of privacy based on the theory or assertion that the location in question was his residence. *See e.g., Rakas v. Illinois*, 439 U.S. at 134 ("A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.").

## ii)    Commercial Property

The undersigned now turns to the argument that the location in question was a commercial business with attached privacy interests. As previously stated, Defendant Weatherford argues that because the location was used solely for business purposes there was no expectation of privacy. ECF No. 59-1 at 9. In his argument, Defendant Weatherford relies on the Fourth Circuit opinion of *United States v. Gray*, 491 F.3d 138 (4th Cir. 2007), for the proposition

that "use of premises solely for commercial purposes (illegal drug sales) negated any expectation of privacy. . ." *Id.*

In its analysis, the *Gray* court reiterated the premise that "[t]o be legitimate, an expectation of privacy must be objectively reasonable: it must flow from 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *Id.* at 145 (citing *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)). When addressing whether an individual engaged in unlawful business activities on another's property has an expectation of privacy, the court held:  "Of course, every perpetrator of an unlawful act hopes for privacy in the sense of not getting discovered or caught. But it is not enough that an individual have a subjective expectation of privacy. Rather, the expectation must be one "which the law recognizes as 'legitimate.'" *Id.* at 145 (citing *Rakas,* 439 U.S. at 144 n.12).  Furthermore, the *Gray* court stated:

> To say that every business visit, however fleeting, gives the visitor a legitimate expectation of privacy in someone else's home strays far from the text and its commonlaw heritage. For "[a]t the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Kyllo,* 533 U.S. at 31 (internal quotations omitted). And while expectations of privacy are at their apex in one's home, they diminish considerably in nonresidential property. An industrial complex does not, of course, "share the Fourth Amendment sanctity of the home." *Id.* at 37. Rather, the "expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home." *Carter,* 525 U.S. at 90 (quoting *New York v. Burger,* 482 U.S. 691, 700 (1987)).

> Moreover, the purpose for which one goes abroad can determine whether an expectation of privacy is legitimate. *See, e.g., United States v. Higgins,* 282 F.3d 1261, 1271 (10th Cir. 2002); *Gamez–Orduño,* 235 F.3d at 458. Indeed, those who venture forth to conduct illegal business often do not hold a legitimate expectation of privacy in locations that are not their own. Someone who hides illegal activity in a vacant field or abandoned warehouse, for example, takes his or her chances that law enforcement officials will happen upon incriminating evidence.

*Id.* at 145–46. The *Gray* court noted that an individual may have an expectation of privacy in his workplace and found "the Supreme Court has held that a worker may have a reasonable expectation of privacy in the desk and file cabinets located in his own private office. . ." *Id.* at 153 (referencing *O'Connor v. Ortega*, 480 U.S. 709, 718-19 (1987)). However, the court found:

> [Defendant] Askew was not in his own private office, but was conducting an extensive drug operation from someone else's home. A defendant cannot simply co-opt another's dwelling for illegal business enterprises. Thus, in *Minnesota v. Carter,* the Supreme Court distinguished similarly situated defendants who were "essentially present for a business transaction" from the "worker in *O'Connor* [who] had . . . his own private office." 525 U.S. at 90–91.

*Id.*

There can be no doubt that at the time of his shooting, Russell was using the location to conduct illegal gambling activities. The inventory of the video poker machines alone is enough to establish that an illegal gambling operation was taking place at the location in question. In response to Defendant Weatherford's argument, Plaintiff cites to numerous cases in which courts have held that business owners have an expectation of privacy in their business premises. ECF No. 76 at 11-13. Though Plaintiff admits that the expectation of a business owner is lower than that of a home owner, Plaintiff argues that in many situations "the Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises as well as to private homes." *Id.* at 12 (citing *New York v. Burger*, 482 U.S. 691, 699 (1987)). However, other than setting out numerous holdings in the context of commercial privacy expectations, Plaintiff ignores the *Gray* holding and does not indicate what legitimate business Russell was conducting at the location in question. In further support of her assertion, Plaintiff cites to *Commonwealth v. Curtin*, 628 A.2d 1132, 1139-40 (Pa. Super. 1993), a Pennsylvania suppression case.

The *Curtin* court held the knock-and-announce rule applies equally to residential and commercial property alike, where commercial property is not open to the general public. *Id.* There, Pittsburgh police instituted a countywide sweep for "video machines [that] were, in fact, being operated in an illegal fashion," and "search warrant applications were assembled for 102 different locations." *Id.* at 1133. Some of the warrants were for businesses open to the public, and some business locations—a warehouse and a business office—were not open to the public. *Id.* at 1133. The *Curtin* court held it is important to recognize the knock-and-announce rule in a commercial setting that is closed to the general public. *Id.* at 1140. Further, the court found: "Where police enter an area of commercial premises that are open to the general public, they could not be mistaken for unauthorized intruders." *Id.* Additionally the court noted that "appellees ha[d] sought to secure their business property from entry by the general public. . . ." *Id.*

The undersigned finds there are too many questions of fact remaining concerning why Russell was using the property in question and whether he was authorized to maintain control over the property, even outside of a commercial setting. As Plaintiff represents, the location in question was not generally open to the public, and there was no sign indicating hours of operation. *See* ECF Nos. 76-4, 76-5. Additionally, three "NO TRESPASSING" signs were displayed on the outside of the building. *See id.* According to Defendant Weatherford's testimony, based on their investigation the police believed that Russell would lock the door at certain times. *See* ECF No. 76-2 at 9. Defendant Weatherford also testified that Russell "was very particular about who [came] into his business." *Id.* at 10. The CI who was inside the location with Russell testified that she opened the door for the officers executing the warrant, and "then they came in." ECF No. 60-4 at 7.

Here, the court does not have the benefit of reviewing Russell's testimony to determine why he was using the location in such an obvious manner. The *Gray* court found that no evidence demonstrated that defendant Askew (the one claiming the Fourth Amendment violation) "exercised control or dominion over the residence, or that he had any private space in the home, as one would often expect with a social guest." *See Gray*, 491 F.3d at 152. However, unlike in *Gray*, the undersigned finds that there are several remaining questions of fact concerning Russell's ability to exercise control or dominion over the location. Establishing residency or a commercial interest are only two ways to demonstrate a reasonable expectation of privacy in property. In a footnote, the *Rakas* Court explained the meaning of a "legitimate" expectation of privacy. 439 U.S. at 143 n.12. There, the Supreme Court found: "[O]ne who owns or lawfully possesses or *controls* property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude. Expectations of privacy protected by the Fourth Amendment, of course, need not be based on a common-law interest in real or personal property, or on the invasion of such an interest." *Id.* (emphasis added). In the undersigned's opinion, Russell's ability to control the property remains an outstanding question of fact. If Russell had some sort of agreement—express, implied, or otherwise—with the property owners that allowed him to control the property, then he would have standing to assert Fourth Amendment rights.

Accordingly, the undersigned recommends denying Defendant Weatherford's Motion for Summary Judgment based on his assertion that Russell lacked a legitimate expectation of privacy in the premises or lacked standing to assert Fourth Amendment protections. Based on this finding, the undersigned addresses the remaining arguments with the presumption that Russell had standing to assert Fourth Amendment rights in the location.

b.    Compliance    with    Knock-and-Announce    Requirement/Exigent
Circumstances

Defendant Weatherford argues that officers complied with the knock-and-announce requirement based on the ram strike against the right-side door. ECF No. 59-1 at 10. Alternatively, Defendant Weatherford argues that the circumstances surrounding the search warrant support the officers' decision not to announce their presence because there was a "legitimate concern for the efficacy of the operation, to catch Russell inside the business and in the act of operating the illegal business, and to make a show of arresting the informant in order to shield her from revelation as an informant and protect her from the suspicion of Russell and other, prior subjects of arrest." *Id.* Plaintiff maintains that officers did not comply with the knock-and-announce rule, which requires officers to "knock on a suspect's door, clearly identify themselves as law enforcement, and wait a reasonable amount of time to permit the suspect to grant entry." ECF No. 76 at 18-19.

The undersigned has reviewed the footage from the chest-cam multiple times and disagrees with Defendant Weatherford's assertion that the ram strike to the right-side door of the building met the requirements of the knock-and-announce rule. First, officers struck one door, made no announcement, then entered through a different door. Additionally, no officer waited any amount of time before attempting to open the right-side door or actually opening the left-side door of the building. Specifically, Defendant Weatherford quickly moved to the left-side door for entry once he discovered that the right-side door was locked or jammed. Furthermore, though officers wore vests with "Sheriff" or "Police" insignia, the undersigned finds it questionable whether the insignia could be seen by the occupants, and finds that officers did not announce their presence prior to entering the building and did not wait a reasonable amount of time prior to their entry. Other than the time it took to move from the right-side door to the left-side door, the

officers did not wait at all. Therefore, the undersigned specifically finds that the ram strike was not equivalent to a "knock" and was used for the purpose of entering the building rather than alerting the inside occupants of police presence on the property. Even if the ram strike could be considered a knock, the undersigned further finds the officers failed to announce their presence and did not wait a reasonable amount of time before entering the location.

Next, the court considers Defendant Weatherford's two-fold argument concerning exemption from the knock-and-announce rule based on exigent circumstances. First, Defendant Weatherford maintains that the officers had a legitimate concern for the efficacy of the operation and wanted to catch Russell inside the business and in the act of operating the illegal business. Next, Defendant Weatherford argues that officers intended "to make a show of arresting the informant in order to shield her from revelation as an informant and protect her from the suspicion of Russell and other, prior subjects of arrest." ECF No. 59-1 at 10.

The undersigned finds the "efficacy of the operation" assertion unconvincing. First, no Defendant alleges or puts forth any evidence indicating what illegal business act they hoped to discover. For example, no Defendant maintains that there was reason to believe that Russell was in the process of selling illegal gambling paraphernalia or helping conduct illegal video poker sales—actions that may cease if officers announced their presence. In fact, no one other than Russell and the confidential informant were inside the location when the search warrant was executed. Moreover, five large video poker machines lined the wall of the location, and it would have been impossible for Russell to dispose of these machines in the reasonable amount of time that should have been afforded him after the officers knocked and announced their presence. Thus, there was no legitimate expectation that evidence was going to be destroyed if officers knocked and announced their presence. The undersigned is also not convinced by Defendant

Weatherford's argument that the officers' need to protect the confidential informant excused their failure to knock and announce. The officers would most certainly have been able to arrest the CI in front of Russell even if they had complied with the knock-and-announce requirement.

Finally, though Defendant Weatherford indicates that he "was not aware of [Russell's five pending criminal sexual conduct ("CSC")] charges, Sheppard was aware of them at the time of the incident, and considered them violent offenses." ECF No. 59-1 at 11. To the extent Defendant Weatherford is arguing that "circumstances presenting a threat of physical violence," excuses the officers' conduct, again the undersigned disagrees. First, Defendant Weatherford admittedly had no knowledge of any alleged violent tendency of Russell. Furthermore, the undersigned has found no caselaw indicating that a CSC charge amounts to a violent offense that excuses compliance with the knock-and-announce requirement. Furthermore, other than these charges, Defendant Weatherford offers no explanation or evidence indicating that officers had reason to believe that Russell would resort to physical violence had he known the officers were present and ready to execute a search warrant.

Therefore, the undersigned declines to find that exigent circumstances or the circumstances surrounding this search warrant execution support the officers' decision not to announce their presence.    Accordingly, the undersigned recommends denying Defendant Weatherford's Motion for Summary Judgment based on his exigent circumstances argument.

B.    Excessive Force Claim

Defendant Weatherford asserts that the use of force in this case was reasonable, and in defense of self and others. ECF No. 59-1 at 13. Defendant Weatherford maintains that he was faced with "imminent peril while attempting to execute a search warrant [because he] and the other officers with him were faced with a loaded handgun drawn by Ernest Russell and pointed

at them, which also risked the life and safety of CI Kate Green." *Id.* at 14. Defendant Weatherford also submits that Plaintiff's own expert "acknowledged and agreed that Russell pointed his gun at the officers, creating an immediate threat to them although he blames the officers for causing Russell to do so." *Id.*[6]

In Response, Plaintiff argues that Defendants used excessive force by fatally shooting Russell after illegally entering his premises. ECF No. 76 at 27. Additionally, Plaintiff cites to *Graham v. Connor*, 490 U.S. 386, 396 (1989), and argues that the three-part test articulated therein indicates that the officers' actions were unreasonable. *Id.* at 28. Further, Plaintiff maintains that when Russell was shot he did not have the "opportunity to process the deadly situation Defendants knew of and had in fact set in motion." *Id.* at 30. Moreover, Plaintiff argues that "[s]everal pieces of evidence question whether Mr. Russell was ever pointing a gun at the officers." *Id.*

The parties correctly reference *Graham v. Connor*, 490 U.S. 386, as the test for evaluating the degree of force used during an arrest. There, the Court established that claims against law enforcement for excessive force in the course of an arrest, investigatory stop, or other "seizure" of a person are properly analyzed under the Fourth Amendment's "reasonableness" standard. *Id.* at 395. The Supreme Court recognized "that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. Further, the Court held that there is not a precise mechanical application of the standard, but "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue,

---

[6] The expert's actual testimony was that he had reviewed Officer McIntyre's statement and was aware that it said Russell was pointing a weapon. ECF No. 76-7 at 85.

whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

Additionally, the Court instructs that an officer's use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Therefore, guided by the authority in *Graham*, the undersigned must examine the totality of the circumstances and the uncontested facts, viewed in the light most favorable to Russell, to determine whether Defendant Weatherford's use of force was reasonable. In taking this view, the undersigned finds that whether excessive force was used remains a question of fact.

The force used by an officer is not excessive if the officer's "actions are 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Id.* at 397; *Schultz v. Braga*, 455 F.3d 470, 477 (4th Cir. 2006). "To gauge objective reasonableness, a court examines only the actions at issue and measures them against what a reasonable police officer would do under the circumstances." *Gandy v. Robey*, 520 F. App'x 134, 140 (4th Cir. 2013) (citing *Rowland v. Perry*, 41 F.3d 167, 172 (4th Cir. 1994)). The United States Supreme Court, the Fourth Circuit, and other circuits have consistently held that officers may use a reasonable amount of force to secure a suspect. *See e.g.*, *Scott v. Harris,* 550 U.S. 372 (2007); *Graham,* 490 U.S. 386; *Thomas v. Holly*, 533 F. App'x 208, 215 (4th Cir. 2013) *cert. denied*, 134 S. Ct. 939 (2014). *Graham* instructs that in analyzing the amount of force used, the court should consider three factors: (1) the severity of the crime at

issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. 490 U.S. at 396. In considering whether an officer used reasonable force, a court must focus on the moment that the force is employed. *Elliott v. Leavitt,* 99 F.3d 640, 644 (4th Cir. 1996). A law enforcement officer has the legal right to use deadly force if the officer has reasonable cause to believe that the suspect poses an immediate threat to the safety of the officer or others, and that deadly force is needed to avoid that threat. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

First, as Plaintiff asserts, the undersigned finds that whether Russell was pointing and presenting a firearm at officers when they entered the location remains a question of fact. The chest-cam footage does not depict whether Defendant Weatherford was confronted with an armed suspect when he entered the premises. The undersigned acknowledges that the video evidence depicts a firearm resting on the counter behind which Russell was sitting in the aftermath of the entry and shooting. However, there is no footage of the shooting as it occurred. Moreover, Plaintiff argues the following set of facts create an issue of fact concerning the firearm issue:

> First, the post-incident investigation did not reveal any of Mr. Russell's DNA on the gun. The gun's handle/trigger were swabbed and Mr. Russell's blood was drawn for DNA analysis. Chain of custody documents show the samples were transferred to the SLED laboratory but SLED did not in any way indicate a match. Second, neither the location of the gun nor the location where Mr. Russell's body came to rest were consistent with Defendants' argument that Mr. Russell was pointing and presenting a firearm at the officers. K. Katsaris Dep. 37:25 – 38:17. Third, despite the officers' claims in their statements, the video clearly shows Officer Weatherford never advised Mr. Russell to drop a gun. Officer Weatherford never referenced the gun at all before shooting.

ECF No. 76 at 30. The undersigned finds that the lack of video evidence, coupled with Plaintiff's ability to prove absence of Russell's DNA on the gun and the improbability that Russell was aiming based on the gun's location in relation to Russell's body, create a question of fact.

In addition, while the undersigned found Plaintiff's standing to assert Fourth Amendment rights is a question of fact, in considering Defendant Weatherford's Motion and viewing the facts in the light most favorable to Russell, the court will assume he had standing and that officers were required to knock and announce their presence prior to entering the location. The officers' failure to meet this requirement contributed to the perilous situation. *Kane v. Lewis*, 989 F. Supp. 2d 468, 470–71 (D. Md. 2013), *aff'd*, 604 F. App'x 229 (4th Cir. 2015) ("[T]he defendants created an unnecessary risk of harm to Cornish by their violation of the knock and announce rule. Indeed, as stated above, one of the very purposes of that doctrine is to afford protections to an occupant of a dwelling. An immediate entry into a dwelling after a knock and announce does not serve that purpose."). Throughout her Response Plaintiff maintains that Defendants' conduct was the cause of Russell's death because the "sudden deployment of a battering ram at Mr. Russell's back door likely induced panic in Mr. Russell then when non-uniformed armed men suddenly entered the front door seconds later, the average person in Mr. Russell's position would be preparing to defend himself." ECF No. 76 at 26. As Plaintiff argues, based on the nature of law enforcement's arrival, "the method of their attempted entry, and Mr. Russell's likely (and expected) response to that behavior, a reasonable officer would expect Mr. Russell to prepare to defend himself." ECF No. 76 at 32. Moreover, the CI's testimony indicates that Russell thought he was being robbed despite the CI's representation that she tried to assure him that police officers were present and not robbers. ECF No. 60-4 at 1-3. Plaintiff also maintains that Defendant Weatherford "never gave Mr. Russell the chance to process the situation or to accede to their entry. . . ." ECF No. 76 at 32. Thus, even assuming without deciding that Russell grabbed his gun, the undersigned finds a jury could find he was justified in arming himself because of his fear of being robbed by someone other than police breaking and entering the location.

The undersigned finds that whether officers were justified in using deadly force in this situation remains a question of fact. This recommended finding is based on remaining factual issues of whether Russell was pointing a firearm at police when police entered the location and the assumption that officers were not justified in failing to knock and announce their presence prior to entering the location. In coming to this conclusion, the undersigned notes the testimony of Defendant Weatherford, Officer McIntyre, and the CI that Russell was pointing a gun at the officers. However, the representations from these witnesses merely create a question of fact and are not conclusive. Additionally, in making this determination, the undersigned has considered the *Graham* factors and finds it only possible to weigh the first of the factors—the severity of the crime. Here, Russell was suspected of taking part in illegal gambling activities, a non-violent crime. Therefore, the first *Graham* factor weighs in Russell's favor. However, the undersigned finds that the second and third *Graham* factors cannot be weighed at this point in the litigation. Specifically, there is a question of fact as to whether Russell posed a deadly threat to police officers when they entered the location (the second factor) and as to whether Russell was actively resisting arrest by arming himself with a firearm and failing to obey instruction from officers (the third factor).

Therefore, in viewing the facts in the light most favorable to Plaintiff, the undersigned cannot find as a matter of law that Defendant Weatherford used an objectively reasonable amount of force during his execution of the search warrant or when he used deadly force against Russell. Accordingly, the undersigned recommends denying summary judgment for Defendant Weatherford concerning Plaintiff's § 1983 Fourth Amendment cause of action.

Defendant Weatherford also argues Plaintiff's claims lack proximate cause. ECF No. 59-1 at 16. He argues that "[e]ven if the Court determines the attempted forcible entry, striking of

the side door with a ram, before a knock and announce, was unconstitutional, that conduct did not harm Ernest Russell, as it did not result in entry nor injury." *Id.* at 16-17. Rather, Defendant Weatherford maintains that "Russell's unlawful and deliberate pointing of a loaded firearm at obvious law enforcement officers was the intervening, superseding, proximate cause of his own death, breaking the causal chain possibly attributable to the defendants." *Id.* at 17. As previous analyzed, the undersigned finds that whether Russell pointed and presented a weapon at law enforcement remains a question of fact. Furthermore, whether he perceived the officers as "obvious law enforcement officers" is also a question of fact. Therefore, the undersigned recommends denying Defendant Weatherford summary judgment based on his lack-of-proximate-cause argument.

C.     Plaintiff's Conspiracy Claim

1.     No Private Right of Action

Defendant Weatherford maintains that Plaintiff's § 1983 conspiracy cause of action does not give rise to a private cause of action for Plaintiff. ECF No. 59-1 at 17. Plaintiff argues that Defendants conspired to cover-up the violations of Russell's constitutional rights. ECF No. 76 at 35. Specifically, Plaintiff maintains that several Defendants conspired by "producing knowingly false statements on the events leading to Mr. Russell's death for the purpose of preventing Plaintiff from discovering the truth and to avoid liability for the damages Defendants' conduct caused." *Id.* at 36.

"To state a claim for conspiracy to deprive an individual of a constitutional right in violation of § 1983, Plaintiff must allege that defendants (1) 'acted jointly in concert' and (2) performed an overt act (3) 'in furtherance of the conspiracy' that (4) resulted in the deprivation of a constitutional right." *Harrison v. Prince William Cnty. Police Dep't*, 640 F. Supp. 2d 688,

706–07 (E.D. Va. 2009) (referencing *Hinkle v. City of Clarksburg,* 81 F.3d 416, 421 (4th Cir. 1996)). In her Complaint, Plaintiff argues that "Defendants conspired and entered into express and/or implied agreements, understandings or meetings of the mind among themselves to deprive Plaintiff and Plaintiff's decedent of their rights as well as their Constitutional rights by giving clearly false statements to SLED during their official investigation." ECF No. 1-1 at 15.

The undersigned finds that Plaintiff has alleged enough facts that, if true, could amount to a claim for conspiracy to deprive an individual of a constitutional right in violation of § 1983. Specifically, the rights at issue in this case concern Russell's Fourth Amendment rights. Therefore, the undersigned recommends denying Defendant Weatherford's Motion for Summary Judgment regarding Plaintiff's § 1983 conspiracy cause of action.

> 2.    No Individual Right of Action for the Personal Representative, nor Violation of an Estate's "Rights, not Violation of the Rights" of a Deceased Person

Defendant Weatherford argues there is no individual conspiracy right of action for the Personal Representative, nor is there a violation of an Estate's "rights," or the "rights" of a deceased person. ECF No. 59-1 at 18. Essentially, Defendant argues that Plaintiff's individual rights are immaterial to the action because she is the Personal Representative of Russell's estate. *Id.* Plaintiff does not address this specific argument in her Response. *See generally* ECF No. 76. Based on Plaintiff's failure to respond to this specific argument, the undersigned finds Plaintiff does not contest Defendant Weatherford's assertion that she cannot legally allege, as personal representative of the estate, a violation of her own rights or of the Estate's rights. Rather, it appears that Plaintiff concedes she may only sue for violations of Russell's constitutional rights. Accordingly, the undersigned recommends granting Defendant Weatherford's Motion for

Summary judgment to the extent he is arguing against awarding damages to Plaintiff for injuries to Plaintiff as an individual.

### 3.    Civil Conspiracy

Defendant Weatherford argues that Plaintiff's allegations of civil conspiracy fail for lack of proof of the elements of civil conspiracy. ECF No. 59-1 at 18. To survive a Motion for Summary Judgment, Defendant Weatherford argues that Plaintiff's evidence must "reasonably lead to the inference that Defendants positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Id.* at 19. Plaintiff argues that the allegedly false statements given by Defendant Weatherford and Officer McIntyre are "directly contradicted by the body camera footage." ECF No. 76 at 37. Based on these contradictions, Plaintiff maintains that these "coordinated exculpatory false statements provide the required evidence of conspiratorial plan and overt act elements of Plaintiff's conspiracy claim, and Defendants' motion for summary judgment on this claim should be denied." *Id.*

Under South Carolina law, "[t]he tort of civil conspiracy has three elements: (1) a combination of two or more persons, (2) for the purpose of injuring the plaintiff, and (3) causing plaintiff special damage." *Hackworth v. Greywood at Hammett, LLC*, 682 S.E.2d 871, 874 (S.C. Ct. App. 2009).  As indicated in the section above, in her Complaint, Plaintiff alleges that multiple Defendants entered into an agreement to deprive Russell of his constitutional rights by giving false statements to SLED during an official investigation. ECF No. 1-1 at 19. As found above, it is reasonable to assume that these actions were intended to deprive Russell of certain constitutional rights.

Here, Defendant Weatherford is arguing that Plaintiff has failed to put forth any evidence to support a cause of action for civil conspiracy. However, the undersigned finds that the footage

from the chest-cam is enough evidence for Plaintiff to overcome Defendant Weatherford's Summary Judgment Motion concerning civil conspiracy. Comparing the footage from the video with Defendants' statements, the undersigned believes there is a question of fact concerning whether Defendants engaged in some sort of civil conspiracy. Whether Plaintiff is able to establish the elements of this cause of action to a jury's satisfaction is not one for the court at this time. For now, the undersigned recommends denying Defendant Weatherford's Motion for Summary Judgment concerning Plaintiff's cause of action for civil conspiracy.

D.     Wrongful Death and Survivor Claims

Defendant Weatherford argues that "[t]o the extent the decedent is alleged to have died as a result of any state law tort allegedly committed by Weatherford, or to have been injured during his lifetime by Weatherford, Weatherford is immune from suit for such a claim, pursuant to S.C. Code § 15-5-90, as he is a government employee of the Darlington County Sheriff, any conduct of Weatherford's which could have caused the death of Ernest Russell was within the scope of his official duties, and did not constitute 'actual fraud, actual malice, intent to harm, or a crime involving moral turpitude.'" ECF No. 59-1 at 19-20.

The South Carolina Tort Claims Act ("SCTCA") grants to the State, its political subdivisions, and employees, while acting within the scope of official duty, immunity from liability for any tort, except as waived therein. S.C. Code Ann. § 15-78-20(b). Section 15-78-70(a) provides that "[t]his chapter constitutes the exclusive remedy for any tort committed by an employee of a governmental entity. An employee of a governmental entity who commits a tort while acting within the scope of his official duty is not liable therefor except as expressly provided for in subsection (b)." However, an employee does not have immunity from suit "if it is proved that the employee's conduct was not within the scope of his official duties or that it

constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude."

S.C. Code Ann. § 15-78-70(b).

Plaintiff brings a wrongful death claim against Defendants under South Carolina's wrongful death statute that provides:

> Whenever the death of a person shall be caused by the wrongful act, neglect or default of another and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, the person who would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, although the death shall have been caused under such circumstances as make the killing in law a felony. In the event of the death of the wrongdoer, such cause of action shall survive against his personal representative.

S.C. Code Ann. § 15-51-10. Plaintiff also brings a survivorship claim pursuant to section 15-5-90 of the South Carolina code. The survival right of action provides:

> Causes of action for and in respect to any and all injuries and trespasses to and upon real estate and any and all injuries to the person or to personal property shall survive both to and against the personal or real representative, as the case may be, of a deceased person and the legal representative of an insolvent person or a defunct or insolvent corporation, any law or rule to the contrary notwithstanding.

S.C. Code Ann. § 15-5-90.

Because the undersigned has determined that a question of fact remains concerning the use of excessive force, whether Russell, had he survived, would have been able to bring such a claim remains in dispute. Furthermore, whether Defendant is entitled to statutory immunity also remains a genuine issue of material fact because, when viewed in the light most favorable to Russell, it appears that Defendant may have acted in a manner that would deprive him of the immunity he would otherwise be granted. Accordingly, the undersigned recommends denying Defendant Weatherford summary judgment as to Plaintiff's wrongful death and survivorship claims.

E.    Qualified Immunity

Defendant Weatherford maintains that he is entitled to qualified immunity from suit. ECF No. 59-1 at 20. Specifically, Defendant Weatherford maintains that "[p]olice officers, like all state actors, are shielded from civil action for monetary damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* Furthermore, Defendant Weatherford argues:

> The law is not clearly established as to whether an officer can enter a dwelling without a warrant when the door is opened and consent is given by an occupant who is not the owner or the person in charge of the dwelling. *Pearson v. Callahan*, 555 U.S. 223 (2009) (further holding the courts may skip directly to the question of qualified immunity before determining whether a constitutional violation occurred, and need not rigidly follow the two-step procedure set out in *Saucier*).[7] And, certainly there was no clearly established precedent holding that a law enforcement officer, equipped with a valid search warrant, acts unreasonably by entering a door unlocked by an occupant of a building that is clearly not a dwelling. Thus, on the subject of the manner of entry into the building with a valid search warrant, announcing his presence, albeit not waiting for a response, Weatherford is entitled to qualified immunity, even if a constitutional deprivation occurred, which is adamantly denied.

> Likewise, when faced with a loaded weapon, Weatherford is entitled to summary judgment on the excessive force claim, and is entitled to qualified immunity, as no clearly established precedent can be found which would cause him to believe, at the time, that his actions were in violation of Russell's rights.

*Id.* at 21. Plaintiff maintains that a defendant is not entitled to qualified immunity when the evidence presents disputed issues of fact. ECF No. 76 at 38. Further, Plaintiff argues the court must view the facts in the light most favorable to Plaintiff at the summary judgment stage. *Id.* Moreover, Plaintiff argues: "Defendants' subjective beliefs regarding the status of Mr. Russell's premises or the perceived threat Mr. Russell posed when officers entered is not relevant." *Id.*

The Supreme Court in *Harlow v. Fitzgerald* established the standard the court is to follow in determining whether a defendant is protected by this immunity. 457 U.S. 800 (1982). That

---

[7] *Saucier v. Katz*, 533 U.S. 194 (2001), *as modified by Pearson v. Callahan*, 555 U.S. 223 (2009).

decision held that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  457 U.S. at 818 (1982).  When evaluating a qualified immunity defense, the court must determine (1) whether the facts alleged, taken in the light most favorable to the plaintiff, show that the defendants' conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the alleged misconduct.  *Pearson v. Callahan*, 555 U.S. 223, 230-33 (2009).  The two prongs of the qualified immunity analysis may be addressed in whatever order is appropriate given the circumstances of the particular case.  *Id.* at 236.  In determining whether the right violated was clearly established, the court defines the right "in light of the specific context of the case, not as a broad general proposition."  *Parrish v. Cleveland*, 372 F.3d 294, 301-03 (4th Cir. 2004).  "If the right was not clearly established in the specific context of the case—that  is, if it was not clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted—then the law affords immunity from suit."  *Id.*  (citations and internal quotation omitted).

At the first step of the qualified immunity inquiry, the court must determine whether, viewing the facts in the light most favorable to Russell, Defendant Weatherford's conduct violated a constitutional right. *See Parrish*, 372 F.3d at 301.  Here, the undersigned has specifically found that the facts alleged and taken in the light most favorable to the Russell show that Defendant Weatherford's conduct could have violated Russell's Fourth Amendment rights.  Under the second step of the qualified immunity test, the court must determine whether Russell's rights were clearly established at the time of the alleged violations. Defendant Weatherford argues that the law is unclear on whether Russell's rights were clearly established at the time of

the alleged violations, and thus, he should be granted summary judgment. ECF No. 59-1 at 21. The proper inquiry is whether "a reasonable officer could have believed" Defendant Weatherford's actions—failing to knock and announce and using deadly force—"w[ere] lawful, in light of clearly established law and the information [Defendant] possessed at the time." *Carpenter v. Seagroves*, No. 5:14-CV-352-F, 2016 WL 3351569, at *8 (E.D.N.C. June 13, 2016) (citing *Orem v. Rephann*, 523 F.3d 442, 488-49 (4th Cir. 2008)). In a qualified immunity analysis, the court is not supposed to recognize a constitutional right in the abstract "but at the level of its application to the specific conduct being challenged." *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992). In *Saucier*, the Supreme Court explained that whether a right is clearly established should be "undertaken in light of the specific context of the case, not as a broad general proposition." 533 U.S. at 201; *see Graham v. Gagnon*, No. 15-1521, 2016 WL 4011156, at *4 (4th Cir. July 27, 2016) ("The right at issue here is not the general right to be free from arrest without probable cause, but rather the right to be free from arrest under the particular circumstances of the case."). The undersigned will consider the second step of the qualified immunity test in turn for each of the alleged Fourth Amendment violations.

In determining whether Defendant Weatherford should be afforded qualified immunity for Plaintiff's Fourth-Amendment-violation cause of action, the court must determine whether a reasonable officer armed with the information Defendant Weatherford possessed at the time of the search warrant's execution would have believed that his actions were lawful. *See Graham*, No. 15-1521, 2016 WL 4011156, at *5 (internal citations omitted) ("In determining what conduct of Graham's was known to the officers, we consider only information actually possessed by the officer[s] at the critical time, or that was then reasonably available to [them], and in light of any exigencies of time and circumstance that reasonably may have affected the officer[s']

perceptions."); *see also Orem v. Rephann*, 523 F.3d 442, 448-49 (4th Cir. 2008). Additionally, though the test "focuses on the objective facts, the immunity inquiry must be filtered through the lens of the officer's perceptions at the time of the incident in question." *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994). The *Rowland* court held: "Such a perspective serves two purposes: First, using the officer's perception of the facts at the time limits second-guessing the reasonableness of actions with the benefit of 20/20 hindsight. Second, using this perspective limits the need for decision-makers to sort through conflicting versions of the 'actual' facts, and allows them to focus instead on what the police officer reasonably perceived." *Id.* (internal citations omitted).

Here, Defendant Weatherford believed that the location in question was only an illegal gambling hall based on objective facts gathered by law enforcement, including audio and video recordings and what he was told was contained in the search warrant. *See* ECF No. 76-2 at 6-7. Here, the validity of the search warrant has not been questioned by any party. Rather, the facts in the warrant were gathered through a police investigation of the premises and based on information obtained from the CI involved in the investigation. Therefore, the more precise question becomes whether a reasonable officer would have believed that entering a building where known illegal gambling activity was taking place without first knocking and announcing was legal. The undersigned finds that a reasonable officer in Defendant Weatherford's position would have reason to believe that it would be legal to dispense with the knock-and-announce requirement.

In the beginning of this R&R, the undersigned determined that there is a question of fact concerning Russell's ability to control the premises. The undersigned reached this conclusion after examining numerous cases on the subject of standing and based on the belief that too many

outstanding factual questions remain. However, any evidence of Russell's legitimate expectation of privacy in the premises was not known to Defendant Weatherford when he executed the search warrant. Here, the search warrant clearly indicates that law enforcement officers had reason to believe that the location was being used solely as a gambling house based on audio and video surveillance. The Fourth Circuit clearly stated in the *Gray* opinion that individuals do not have privacy expectations over locations where solely illegal business operations are being conducted. 491 F.3d at 157. Therefore, based on the *Gray* opinion and other controlling precedent concerning an individual's ability to have standing, the undersigned finds it was reasonable for Defendant Weatherford to believe it was not unlawful for him not to knock and announce his presence. Accordingly, the undersigned recommends finding Defendant Weatherford has qualified immunity as to Plaintiff's cause of action for unreasonable search and seizure in violation of the Fourth Amendment.

However, the undersigned recommends the opposite finding when determining whether Russell's Fourth Amendment rights were clearly established when Defendant Weatherford used deadly force against him. In a recent Fourth Circuit opinion, the court held that outstanding factual issues precluded granting a law enforcement officer qualified immunity at the summary judgment stage. *Connor v. Thompson*, No. 15-1353, 2016 WL 1731606, at *7 (4th Cir. May 2, 2016). There, the *Connor* court specifically found: "The facts, as we must view them for purposes of summary judgment, would be sufficient to support a trier of fact's finding that shooting Carter amounted to excessive force. Moreover, a reasonable officer would know that shooting Carter under the circumstances presented by Appellee's version of the facts would be unlawful." *Id.* In another Fourth Circuit opinion dealing with excessive force, the court accepted "as true the facts that the district court concluded may be reasonably inferred from the record

when viewed in the light most favorable to the plaintiff." *Yates v. Terry*, 817 F.3d 877, 884 (4th Cir. 2016) (internal citation omitted). Based on the guidance from the Fourth Circuit and the undersigned's previous finding that it would be reasonable to infer that Russell was not brandishing a weapon at officers when they entered the Darlington location, the undersigned finds that qualified immunity is not warranted on Plaintiff's cause of action for excessive force in violation of the Fourth Amendment.

Based on this material question of fact, the court finds the proper inquiry, in viewing the evidence in light most favorable to Plaintiff, would be whether an officer would reasonably believe that using deadly force was lawful when faced with an individual who had a weapon within an arm's reach but was not pointing and presenting his weapon. The undersigned finds— on this excessive force inquiry—that Russell's right to be free from deadly force existed when officers entered the location because a jury could conclude that Russell was not aiming a firearm at officers. Had the chest-cam footage depicted Russell pointing a firearm at police, then his right to be free from use of deadly force would not have been clearly established. *Wingrove v. Forshey*, 230 F. Supp. 2d 808, 822 (S.D. Ohio 2002) ("Although the Defendants may be correct that it would have been reasonable for them to shoot at Delbert if he was aiming a gun at them and refused to put that gun down despite their commands, the Plaintiffs dispute that version of the facts."). However, whether Russell was brandishing a weapon is a disputed material factual question and precludes Defendant Weatherford's qualified immunity defense on this cause of action at this stage.

Accordingly, the undersigned recommends granting Defendant Weatherford qualified immunity on the alleged Fourth Amendment failure to knock-and-announce violation and denying Defendant Weatherford qualified immunity on the alleged excessive force violation.

F.    Joint and Several Liability

Defendant Weatherford argues that joint and several liability does not apply to this action brought under § 1983 because federal claims can be based only on individual actions. ECF No. 59-1 at 22. Further, Defendant Weatherford maintains that for South Carolina state claims, the South Carolina Tort Claims Act calls for a special verdict with liability only as apportioned by a jury, pursuant to section 15-78-100 of the South Carolina Code. *Id.*

In full, section 15-78-100 indicates:

(a) Except as provided for in Section 15-3-40, an action for damages under this chapter may be instituted at any time within two years after the loss was or should have been discovered. Provided, that if a claim for damages was filed and disallowed or rejected an action for damages filed under this chapter, based upon the same occurrence as the claim, may be instituted within three years after the loss was or should have been discovered.
(b) Jurisdiction for any action brought under this chapter is in the circuit court and brought in the county in which the act or omission occurred.
(c) In all actions brought pursuant to this chapter when an alleged joint tortfeasor is named as party defendant in addition to the governmental entity, the trier of fact must return a special verdict specifying the proportion of monetary liability of each defendant against whom liability is determined.

Because the issue of damages is best resolved at the trial stage, the undersigned finds the question of whether Defendant Weatherford would be jointly and severally liable for damages is premature. Accordingly, the undersigned recommends denying Defendant Weatherford's Motion on this issue with leave to re-assert this argument at the appropriate time.

IV.    Conclusion and Recommendation

Based on the foregoing, it is recommended that Defendant Weatherford's Motion for Summary Judgment, ECF No. 59, be *granted* in part and *denied* in part. Specifically, the undersigned recommends granting Defendant Weatherford summary judgment on Plaintiff's § 1983 claim for Fourth Amendment knock-and-announce violations based on qualified immunity. However, based on disputed facts, the undersigned recommends denying Defendant Weatherford

summary judgment on Plaintiff's Fourth Amendment cause of action for excessive force and all remaining causes of action.

IT IS SO RECOMMENDED.

August 19, 2016                                          Kaymani D. West
Florence, South Carolina                                United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 2317
Florence, South Carolina 29503

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).