IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Ernestine Wingate as the Personal Representative of the Estate of Ernest Russell, | ) ) ) ) | Civil Action No.: 4:13-3343-BHH |
| Plaintiff, | ) ) | **ORDER AND OPINION** |
| vs. | ) ) ) | |
| Wayne Byrd, both individually and in his Official capacity as the Sherriff of Darlington County; Darlington County Sherriff's Office; The County of Darlington; The City of Darlington Police Department; The City of Darlington; Ben Weatherford; Clyde M Shephard; And John Does 1-10, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |
| _____ | ) | |

This action arises out of the execution of a search warrant, resulting in the death of Ernest Russell ("Russell"). On October 18, 2013, Plaintiff Ernestine Wingate ("Plaintiff"), as personal representative of the estate of Russell, filed this 42 U.S.C. § 1983 action alleging Defendants violated Russell's Fourth and Fourteenth Amendment rights. In accordance with 28 U.S.C. § 636(b)(1) and Local Civil Rule 73.02 D.S.C., this matter was referred to United States Magistrate Kaymani D. West, for consideration of pretrial matters. The Magistrate Judge prepared three thorough Report and Recommendations, addressing Defendants' various motions for summary judgment. The first Report and Recommendation, ("Report One"), recommended granting in part and

denying in part Defendant Ben Weatherford's ("Weatherford") motion for summary judgment. (ECF No. 116.) Specifically, the Magistrate Judge recommended granting Weatherford summary judgment on Plaintiff's § 1983 claim for Fourth Amendment knock-and-announce violations based on qualified immunity. (*Id.* at 41.) However, she recommended denying Weatherford summary judgment on Plaintiff's Fourth Amendment cause of action for excessive force and for all remaining causes of action. (*Id.* at 41–42.) The second Report and Recommendation, ("Report Two"), recommended granting Defendants Wayne Byrd, Darlington County Sherriff's Office, and the County of Darlington's motion for summary judgment and dismissing these Defendants. (ECF No. 118.) The third Report and Recommendation, ("Report Three"), recommended granting Defendants City of Darlington, Darlington Police Department, and Clyde M. Sheppard's motion for summary judgment and dismissing these Defendants. (ECF No. 119.) Defendant Weatherford filed timely objections to Report One (ECF No. 125), and Plaintiff filed timely objections to Reports One and Two (ECF Nos. 124; 126).

For the reasons set forth herein, the Court adopts Report One in part. Specifically, the Court adopts the portion of Report One denying Weatherford summary judgment on Plaintiff's excessive force claims and claims for wrongful death, survivorship, and civil conspiracy, and granting Weatherford summary judgment on Plaintiff's claim for Fourth Amendment knock-and-announce violations. However, the Court modifies Report One by dismissing Plaintiff's § 1983 conspiracy claim against Weatherford. The Court adopts Reports Two and Three and dismisses Defendants Wayne Byrd, Darlington County

Sherriff's Office, County of Darlington, City of Darlington, Darlington Police Department, and Clyde M. Sheppard from this action.

## **BACKGROUND AND PROCEDURAL HISTORY**

The Report sets forth in exhaustive detail the relevant facts and standards of law, and the Court incorporates them and summarizes below only in relevant part. Plaintiff filed this matter on October 18, 2013, bringing § 1983 claims for: (1) unlawful search, excessive force, and a violation of due process under the Fourth and Fourteenth Amendments against all Defendants; (2) deliberate indifference against Defendants Byrd, Darlington County Sherriff's Office, and Darlington County; and, (3) conspiracy against the state actors and civil conspiracy against the non-state actors . (ECF No. 1-1 ¶¶ 46–47, 56–57, 67–68.) Plaintiff also brings claims under South Carolina law for: (1) civil conspiracy; (2) negligence and gross negligence against Defendants Byrd, Darlington County Sherriff's Office, Darlington County, Darlington County Police, and the City of Darlington; (3) wrongful death; and (4) a "survivorship action." (*Id.* ¶¶ 64–66, 73–78.)

On January 12, 2016, Defendant Weatherford moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (ECF No. 59.) On January 13, 2016, the remaining Defendants also moved for summary judgment. (ECF Nos. 63; 64.) After consideration of Plaintiff's response filed in opposition to these motions for summary judgment (ECF No. 76) and Defendants' replies (ECF Nos. 80; 82), the Magistrate Judge prepared three thorough Report and Recommendations. (ECF Nos.

116; 118; 119.) The Court has reviewed the objections to the Reports,[1] and finds them to be largely without merit. Therefore, it will enter judgment accordingly.[2]

## STANDARD OF REVIEW

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight. The responsibility for making a final determination remains with this Court. *Mathews v. Weber*, 423 U.S. 261, 270 (1976). The Court is charged with making a *de novo* determination of any portions of the Report and Recommendation to which a specific objection is made. The Court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or may recommit the matter to the Magistrate Judge with instructions. *See* 28 U.S.C. § 636(b)(1). The Court need not conduct a *de novo* review when a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982). In the absence of a timely filed, specific objection, the Magistrate Judge's conclusions are reviewed only for clear error. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005).

## DISCUSSION

### A.    Report One

In Report One, the Magistrate Judge recommended granting Defendant Weatherford summary judgment on Plaintiff's § 1983 claim for Fourth Amendment knock-and-announce violations based on qualified immunity. (*Id.* at 41.) However, she

---

[1] The parties have only filed specific objections to Reports One and Two. (ECF Nos. 124; 125; 126.)
[2] As always, the Court says only what is necessary to address the parties' objections against the already meaningful backdrop of the thorough Reports of the Magistrate Judge; exhaustive recitation of law and fact exists there.

recommended denying Defendant Weatherford summary judgment on Plaintiff's Fourth Amendment cause of action for excessive force and § 1983 conspiracy cause of action. (*Id.* at 41–42.) She also recommended denying Weatherford summary judgment on Plaintiff's state law claims for civil conspiracy, wrongful death, and her survivorship action. (*Id.* at 33–34.)

### 1.    Defendant Weatherford's Objections

Defendant Weatherford objects to Report One on two grounds, arguing that the Magistrate Judge erred in: (1) finding that a question of fact remains as to whether Weatherford used excessive force in executing the search warrant; and, (2) finding that Plaintiff's civil conspiracy claim should survive summary judgment. (ECF No. 125 at 1–13.) The Court addresses these objections in turn.

### a.    Excessive Force Claim

Plaintiff alleges that Defendant Weatherford used excessive force by fatally shooting Russell when executing the search warrant. (ECF No. 1-1 ¶ 46–47.) "The Fourth Amendment governs claims of excessive force during the course of an arrest, investigatory stop, or other 'seizure' of a person." *Riley v. Dorton*, 115 F.3d 1159, 1161 (4th Cir. 1997) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010); *see also Tennessee v. Garner*, 471 U.S. 1 (1985). Thus, claims that law enforcement officers have used excessive force in the course of an arrest or other seizure should be analyzed under the Fourth Amendment and its reasonableness standard. *See Graham*, 490 U.S. at 395. In determining whether the force used in the context of an arrest is reasonable under the

Fourth Amendment, the Court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (citing *Garner*, 471 U.S. at 8–9). Moreover, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. And the "reasonableness" inquiry in the context of the Fourth Amendment is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their intent or motivation." *Id.* at 397.

Here, the Magistrate Judge found that the *Graham* factors did not conclusively establish the reasonableness of Weatherford's actions in using deadly force against Russell. (ECF No. 116 at 29.) She found that the first factor—the severity of the crime— weighed in favor of Russell. (*Id.*) As she correctly noted, Russell was suspected of taking part in illegal gambling activities, a non-violent crime. (*Id.*) However, the Magistrate Judge determined she could not weigh the second two *Graham* factors because there remained genuine issues of material fact as to whether Russell posed a deadly threat to

the officers and whether he was actively resisting arrest by arming himself with a firearm. (*Id.*)

In finding a question of fact as to whether Russell was pointing and presenting a firearm at the officers when they entered the building where the shooting occurred, the Magistrate Judge cited "the lack of video evidence, coupled with Plaintiff's ability to prove absence of Russell's DNA on the gun and the improbability that Russell was aiming based on the gun's location in relation to Russell's body." (*Id.* at 27.) She further found that even if Russell had grabbed his gun, "a jury could find he was justified in arming himself because of his fear of being robbed by someone other than police breaking and entering the location." (*Id.* at 28.) She concluded that whether Weatherford was justified in using deadly force in this situation remains a question of fact. (*Id.* at 29.)

Weatherford first objects that the Magistrate Judge erred in finding an issue of material fact as to whether Russell was pointing and presenting a firearm at the officers when they entered the building to execute the search warrant. On this point, Weatherford asserts that she disregarded the video evidence and failed to evaluate the totality of the evidence before the Court. (ECF No. 125 at 1.) He contends that the Magistrate Judge erred in stating "there is no footage of the shooting as it occurred" and ignored the fact that Weatherford can be heard announcing "Sherriff's Office!" when entering the building. (*Id.* at 2.) He further contends that the video "shows that, as the second officer, Robert McIntyre, entered the building and came around the left side of the first officer, Weatherford, where he could now clearly see Ernest Russell, McIntyre dives defensively to his left, toward the cover of a refrigerator, and raises his arm, firing upon Russell."

ECF No. 125 at 3.) According to Weatherford, "[t]he exercise of common sense leads to the conclusion that McIntyre observed an immediate threat from Russell." (*Id.*)

According to Weatherford, the video evidence, combined with the testimony from the confidential informant and other officers at the scene, supports the conclusion that Russell crouched behind the counter when the officers entered the building and came up with a firearm in his hand. (ECF No. 125 at 3.) He cites the scene photographs as further support of this conclusion, noting that the photographs depict the close proximity of the gun to Russell's body after his death. (*Id.* at 3–4.) Weatherford also contends that the Magistrate Judge improperly relied on the deposition testimony of Plaintiff's proposed expert witness, Ken Katsaris ("Katsaris"), in reaching her conclusions. (*Id.* at 4.)

The Court has reviewed the evidence in the record, including the video evidence. Contrary to Weatherford's assertions, the Court finds that the Magistrate Judge thoroughly and accurately recounted the video evidence depicting the execution of the search warrant as recorded by a chest camera worn by Officer Specht. She summarized the video as follows:

> During daylight hours, officers exited a vehicle and approached the side of a white building with two doors. The first door (the right-side door) had a glass or plastic storm door covering a wooden door. Officers opened the first door, and one officer (now known to be Defendant Weatherford) attempted to twist the inside wooden door's knob but finds it is locked. This officer then walks toward the other side door (the left-side door). At this point in the video, Officer Specht is behind two officers, and the first in line is wearing a vest with "SHERIFF" written across the back. One officer, the second officer (now known to be Officer McIntye), hits the locked wooden door with a battering ram, but the door does not open. This officer has "POLICE" written across the back of his vest. The second officer runs to the left-side door where the first officer is approaching. Based on the count-down clock on the video, this initial entry—the time officers exited the police vehicle to the time the first and second officers entered the left-side door—took approximately 20 seconds.

8

The first officer (Defendant Weatherford) enters, without knocking, through the left-side door. The video does not depict images from inside the house in the moments immediately following the first officer's entry. Next, the two officers (Officers McIntyre and Specht) following the first officer also enter the location through this door. Loud shouting is heard as the second officer enters into the location, and the third officer is immediately behind him. The video depicts a woman (the confidential informant) standing towards the front of the room, and the officers pass her during their entry. More yelling is heard, and several shots are fired. It is unclear from the video who fired the shots or the circumstances leading to the firing of the shots. One officer, with "SHERIFF" written on the front and back of his vest, looked at the camera and said, "he pointed a gun at me." Based on the countdown clock on the video, 46 seconds elapsed between time of both officers' entry until the declaration by the officer (Defendant Weatherford).

After the shooting, the officers re-enter the location, and one officer says, "where's the gun now?" Russell is seen sitting or slumped behind a counter, and there is black gun lying on the counter to the left of where Russell's body is resting. One of the officers then goes outside and re-enters with a camera. Officer Specht then surveys the room and takes several photographs. Five video poker machines are seen lining one of the walls of the room.

(ECF No. 116 at 3–4.)

The Court agrees with the Magistrate Judge's account of the video. Because the video is from the recording of Officer Specht's chest camera, the viewer is necessarily limited to what was observed and heard by Officer Specht. Officer Specht appears to have entered the building just before the shots were fired. However, as stated by the Magistrate Judge, "[i]t is unclear from the video who fired the shots or the circumstances leading to the firing of the shots." (ECF No. 116 at 4.) The video is very shaky during the shooting. The Court agrees with Weatherford that for a brief moment, the video displays what appears to be Russell's head behind the counter, with the rest of his body hidden. However, such body language equally supports the conclusion that Russell was

9

shielding himself from the officers' sudden entry, as it does the conclusion that Russell was attempting to grab a firearm. The Court also agrees with Weatherford that the video depicts, for a brief moment, an officer diving down toward the refrigerator. However, it is unclear from the video whether the officer is firing upon Russell. In addition, such body language equally supports the conclusion that the officer was diving down to avoid getting shot in the back by Weatherford as Weatherford was firing at Russell, as it does the conclusion that the officer was avoiding "an immediate threat from Russell." (*Id.*) Further, while the Court agrees with Weatherford that it appears he announced "Sherriff's Office" upon entering the building, the sound is muffled. The Court is not convinced that Weatherford's statement upon entering the building is an established fact.

The Court also finds it was proper for the Magistrate Judge to consider the testimony of Katsaris in finding an issue of fact as to whether Russell was aiming a gun when Weatherford fired at Russell. Katsaris offered testimony as Plaintiff's proposed expert witness based on his experience in law enforcement training and as a crime scene investigator. (ECF No. 133-1, Katsaris Dep. 16:1-21, 37:25-38:1-2.) Upon examining the crime scene photos, Katsaris opined that the gun was "far away" from Russell's body and not where investigators would expect it to be had Russell held the gun and raised it in the moments before he was shot. (*Id.*, Katsaris Dep. 37:25-38:1-17.)

Here, Weatherford argues that such testimony is not needed nor allowed where the expert is testifying on the credibility of other witnesses and on "matters of common observation in which a judge and jury can determine through their own eyes and their common sense." (ECF No. 125 at 4.) The Court does not find that the testimony

10

highlighted above expressly comments upon the credibility of any witnesses, nor does the testimony invade the province of the factfinder. Such evidence is admissible under Federal Rule of Evidence 702. Katsaris' experience in crime scene investigations renders his testimony on the position of the gun helpful to the factfinder and beyond the common knowledge of a layperson. *See* F.R.E. 702 (Rule 702(a) permits expert testimony if the expert's "knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"); *Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052, 1055 (4th Cir. 1986) ("Rule 702 makes inadmissible expert testimony as to a matter which obviously is within the common knowledge of jurors.").

Weatherford cites a Sixth Circuit case, *Gaddis v. Redford Township*, 364 F.3d 763 (6th Cir. 2004), for the proposition that the evidence available in the instant matter is sufficient to find no material dispute of fact that Russell presented a gun at Weatherford. In *Gaddis*, the court held that officers acted reasonably when using deadly force to seize a mentally impaired man who allegedly threatened officers with a knife during a traffic stop. 364 F.3d at 772–777. Although a dashboard camera recorded the interaction, it was of such "low quality," that the court could not determine whether the suspect actually had the knife as the officers claimed. *Id.* at 773. The court noted that "[s]ince [the decedent] could not testify, the only relevant evidence is the videotape and the testimony of the four officers." *Id.* The court found that the body language of the officers as depicted in the video reinforced the officers' testimony that there was a knife. *Id.* In addition, the video depicted the suspect "react[ing] violently: he wheeled and struck at [an officer] with his right, then his left hand." *Id.* The court found the suspect's strike "was

11

a windmilling motion arguably suggestive of an attempt to stab with a knife," and concluded that "[a]ll admissible evidence in the case points to the conclusion that the knife was present." *Id.*

A similar conclusion is not warranted here, where there is evidence disputing the assertion that Russell was presenting the gun. The *Gaddis* case presents the legal conclusion that Weatherford seeks, but the facts are readily distinguishable. As the Magistrate Judge noted, Plaintiff presented evidence that a post-incident investigation did not reveal any of Russell's DNA on the gun. (ECF No. 76-14.) In addition, Katsaris's testimony disputes the likelihood that Russell was aiming the gun based on the gun's location in relation to Russell's body. Finally, for the reasons stated above, the video evidence, when viewed in the light most favorable to the Plaintiff, does not establish that Russell was pointing and presenting a firearm at the officers. Unlike in *Gaddis*, Russell's head is seen only for the briefest of moments—the Court does not have the benefit of observing Russell's body language throughout his interaction with the officers, and the Court is not permitted to draw any inferences in the movant's favor at this procedural stage.

Weatherford's final objection related to the excessive force claim is that the Magistrate Judge improperly incorporated the knock and announce requirement into the excessive force analysis, "essentially finding that Weatherford 'teed up' the confrontation with an armed Ernest Russell." (ECF No. 125 at 7.) He asserts that the inquiry here "is whether Weatherford acted reasonably in employing force," and that it is irrelevant whether Russell acted reasonably in arming himself. (*Id.* at 7–8.)

After finding a genuine issue of material fact as to whether Russell was presenting and pointing a gun during the incident, the Magistrate Judge found that the officers' failure to comply with the knock and announce requirement "contributed to the perilous situation." (ECF No. 116 at 28.) Her reasoning appears to be that, given the manner in which the officers entered the building, "a reasonable officer would expect Mr. Russell to defend himself." (*Id.*) The Magistrate Judge concluded that even if Russell had grabbed his gun, "a jury could find he was justified in arming himself because of his fear of being robbed by someone other than police breaking and entering the location." (*Id.*)

The Court agrees with Weatherford that the events preceding the deadly shooting should not have been considered in the excessive force analysis. The Fourth Circuit has consistently found that pre-seizure conduct is irrelevant to the reasonableness inquiry in an excessive force analysis. For example, in *Greenidge v. Ruffin*, 927 F.2d 789 (4th Cir. 1991), the Fourth Circuit considered whether a district court had properly excluded evidence which established that prior to the time at which the plaintiff had been shot by a police officer, the officer violated "standard police procedure for night time prostitution arrests." *Id.* at 791. Plaintiffs alleged that the officer "recklessly created a dangerous situation during the arrest" by violating standard police procedures and that this violation was probative on the issue of her reasonableness. *Id.* The trial court excluded evidence of the officer's alleged violation of police procedures immediately preceding the shooting. *Id.* at 790. In affirming this exclusion, and holding that the evidence of the officer's alleged violations prior to the shooting was "not relevant," the Fourth Circuit relied upon the following reasoning in *Graham*: (1) The "reasonableness" of an officer's particular

13

use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"; (2) "reasonableness" means "the standard of reasonableness at the moment"; and (3) "split-second judgments" are often required to be made. *Id.* at 791–792.

The Fourth Circuit reaffirmed *Greenidge* two years later in *Drewitt v. Pratt*, 999 F.2d 774 (4th Cir. 1993). In *Drewitt*, the court held that an off-duty plainclothes police officer who failed to display his badge when attempting to stop a fleeing robbery suspect was entitled to a qualified immunity defense. 999 F.2d at 780. Relying upon *Greenidge*, the court held that the failure to display the badge (a requirement of state law) was "irrelevant to the issue of whether at the moment of the shooting, [the officer] had probable cause to believe that [the suspect] posed a threat of death or serious bodily harm to him." *Id.* at 779–780.

More recently, the Fourth Circuit has held that "[a] police officer's pre-seizure conduct, regardless of whether it was ill-advised or violative of law enforcement protocol, is generally not relevant for purposes of an excessive force claim under the Fourth Amendment which looks only to the moment force is used." *Gandy v. Robey*, 520 F. App'x 134, 142 (4th Cir. 2013). *Greenidge*, *Drewitt*, and *Gandy* make clear that the Court is to focus only upon the reasonableness of the conduct at the moment Weatherford made the decision to use deadly force. *See also Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) ("*Graham* requires us to focus on the moment force was used; conduct prior to that moment is not relevant in determining whether an officer used reasonable force.").

14

Thus, Weatherford's alleged failure to comply with the knock and announce requirement is not relevant here.

However, such a finding does not resolve Plaintiff's excessive force claim. For the reasons discussed above, the Court has found a genuine issue of material fact as to whether Russell was pointing and presenting a firearm at the time deadly force was used against him. Thus, as the Magistrate Judge correctly noted, the second and third *Graham* factors cannot be weighed at this point in the litigation. Because a question of fact remains as to whether Russell posed a deadly threat to the officers when they entered the building (second factor), and as to whether Russell was actively resisting arrest by arming himself with a firearm (third factor), the Court cannot find as a matter of law that Weatherford used an objectively reasonable amount of force when he used deadly force against Russell. *See Graham*, 490 U.S. at 396. Accordingly, the Court denies Weatherford summary judgment on Plaintiff's excessive force claim and overrules his objection.

### i.    Wrongful Death and Survivorship Action

The Court's denial of summary judgment on the excessive force claim has implications for Plaintiff's wrongful death and survivorship actions under South Carolina law.

South Carolina's wrongful death statute provides that

Whenever the death of a person shall be caused by the wrongful act, neglect or default of another and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, the person who would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, although the death shall have been caused under such circumstances as make the

> killing in law a felony. In the event of the death of the wrongdoer, such
> cause of action shall survive against his personal representative.

S.C. Code Ann. § 15-51-10.

South Carolina also provides a survivorship cause of action. The applicable

statute states that

> Causes of action for and in respect to any and all injuries and trespasses to
> and upon real estate and any and all injuries to the person or to personal
> property shall survive both to and against the personal or real
> representative, as the case may be, of a deceased person and the legal
> representative of an insolvent person or a defunct or insolvent corporation,
> any law or rule to the contrary notwithstanding.

S.C. Code Ann. § 15-5-90.

The Magistrate Judge found that because a genuine issue of material fact

precluded granting summary judgment on the excessive force claim, a question of fact

existed as to whether Russell would have been able to bring such a claim had he

survived. (ECF No. 116 at 34.) She further determined that whether Weatherford was

entitled to any statutory immunity provided under South Carolina law was a genuine

issue of material fact, given that "it appears that Defendant may have acted in a manner

that would deprive him of the immunity he would otherwise be granted." (*Id.*)

Weatherford's brief arguments for dismissal of Plaintiff's state law wrongful death

claim are wholly based on the Court granting summary judgment on Plaintiff's excessive

force claim. (ECF No. 125 at 10.) Because the Court has found the Magistrate Judge

appropriately denied summary judgment on the excessive force claim, Weatherford's

arguments here do not warrant discussion. The Court agrees with the Magistrate Judge

that a genuine issue of material fact exists as to Plaintiff's wrongful death claim and

survivorship action, given the Court's finding that Plaintiff's excessive force claim should survive summary judgment. Further, Weatherford makes no specific objections to the Magistrate Judge's reasoning on Plaintiff's survivorship action—the Court finds that said reasoning evinces no clear error. *See Diamond*, 416 F.3d at 315 (holding *de novo* review unnecessary in the absence of a timely filed, specific objection). Accordingly, the Court denies Weatherford's motion for summary judgment as to the wrongful death claim and survivorship action.

### b.     Conspiracy Claims

The Court construes the Complaint to allege both a § 1983 conspiracy claim and a claim for civil conspiracy under South Carolina law. (ECF No. 1-1 ¶¶ 67–72.)

### i.     Conspiracy under § 1983

To establish a civil conspiracy under § 1983, plaintiff must show that defendants acted in concert in furtherance of the conspiracy which resulted in plaintiff's deprivation of a constitutional right. *Hinkle v. City of Clarksburg, W.Va.*, 81 F.3d 416, 421 (4th Cir. 1996) (citing *Hafner v. Brown*, 983 F.2d 570, 577 (4th Cir. 1992)). Here, the Magistrate Judge found that "Plaintiff has alleged enough facts that, if true, could amount to a claim for conspiracy to deprive an individual of a constitutional right in violation of § 1983." (ECF No. 116 at 31.) She further found that because Plaintiff apparently conceded that she cannot legally allege a violation of her rights as personal representative of the estate, Plaintiff could only sue for violations of *Russell's* constitutional rights. (*Id.*)

Weatherford first argues that Plaintiff cannot pursue redress on Russell's behalf for constitutional violations that occurred only after Russell's death.[3] (ECF No. 125 at 10.) In her reply, Plaintiff concedes this fact. (ECF No. 133 at 14.) Indeed, it is well established that section 1983 does not provide a cause of action on behalf of a deceased for events occurring after death. *See Guyton v. Phillips*, 606 F.2d 248, 250 (9th Cir. 1979) ("[T]he Civil Rights Act, 42 U.S.C. §§ 1983 and 1985, does not provide a cause of action on behalf of a deceased based upon alleged violation of the deceased's civil rights which occurred after his death."); *Silkwood v. Kerr–McGee Corp*, 637 F.2d 743, 749 (10th Cir. 1980) (rejecting a *Bivens* claim, holding: "We agree with the Ninth Circuit that the civil rights of a person cannot be violated once that person has died."); *Riley v. St. Louis County of Mo.*, 153 F.3d 627, 632 n.1 (8th Cir. 1998) (holding that section 1983 does not provide a cause of action on behalf of a deceased for events occurring after death); *Estate of Morris ex rel. Morris v. Dapolito*, 297 F. Supp. 2d 680, 691 n. 9 (S.D.N.Y. 2004) (referring to "the well established proposition stated in *Ford v. Moore*, 237 F.3d 156, 165 (2d Cir. 2001), that . . . a dead person has no constitutional rights[.]").

However, Plaintiff argues in her reply that as personal representative of Russell's estate, she is "a proper party to bring the conspiracy claim arising from Weatherford's attempt to cover up his unlawful conduct." (ECF No. 133 at 14.) She asserts that her injury is her due process right of access to the courts. (*Id.*) Plaintiff acknowledges that she has been able to file a suit to bring claims against Weatherford, but contends that

---

[3] It is undisputed that the allegations of conspiracy concern conduct that occurred only after Russell's death. (*See* ECF No. 1-1 at 19–20, Compl. ¶ 68 ("Defendants conspired . . . to deprive Plaintiff and Plaintiff's decedent of their rights as well as their Constitutional rights by giving clearly false statements to SLED during their official investigation.").)

"his lack of candor regarding the last moments of Mr. Russell's life has substantially hampered Plaintiff's ability to discover the truth and to pursue adequate redress for what Mr. Russell's family has lost." (*Id.*) In support of her ability to bring a claim for conspiracy, Plaintiff cites *Love v. Bolinger*, 927 F. Supp. 1131 (S.D. Ind. 1996), and *Hickenbottom v. Nassan*, No. CIV.A. 03-223, 2007 WL 7753803 (W.D. Pa. Mar. 29, 2007). (*Id.*) Upon review, the Court finds that these cases actually weigh against finding the existence of such a claim here. In both cases, the court ultimately denied the plaintiffs' right of access claim, finding that they had not alleged facts sufficient to support such a claim. *Hickenbottom*, 2007 WL 7753803, at *38; *Love*, 927 F. Supp. at 1138–1139.

In *Hickenbottom*, the court recognized that a personal representative "may bring a claim for conspiracy if he can show that defendants' alleged conspiracy violated his right to due process by hampering his ability to bring his claims for wrongful death in court." 2007 WL 7753803, at *37. The court went on to clarify, however, that "not every act of deception in connection with a judicial proceeding gives rise to a constitutional violation." *Id.* (citing *Bell v. City of Milwaukee*, 746 F.2d 1205, 1261 (7th Cir. 1984), *overruled on other grounds by Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005)). Similarly, the *Love* court also acknowledged that a decedent's estate could bring a cause of action for the alleged cover-up of the circumstances of the decedent's death "where the cover-up obstructs legitimate efforts to vindicate the killing through judicial redress." 927 F. Supp. at 1138 (citing *Bell*, 746 F.2d at 1261). However, the court noted "it is important to recognize that 'there is no general constitutional or federal 'right to truth.'" *Id.* (quoting *Bolden v. Ramos et al.*, No. 93 C 3416, 1996 WL 66135 at *11 (N.D. Ill., Feb. 13, 1996)).

In both cases, the courts discussed in detail the limitations of such a cause of action, citing *Bell* as the exemplary case for this type of claim. *Hickenbottom*, 2007 WL 7753803, at *37; *Love*, 927 F. Supp. at 1138. In *Bell*, the Seventh Circuit Court of Appeals held that a successful twenty-year cover-up of a police killing obstructed the deceased's survivors' right of access to the courts. 746 F.2d at 1264. As the *Hickenbottom* court notes, "[t]he holding in *Bell* was motivated in large part by the egregious police conduct in that case and the extensive delay it caused." 2007 WL 7753803, at *37 (citing *Bell,* 746 F.2d at 1264 ("our holding is limited to the particularly egregious set of facts herein. . . . [T]he conspirators did everything in their power to cover up and conceal the facts within their sole control."). The *Love* court observed that more recent Seventh Circuit cases have reached a different result from that in *Bell*, consistently finding that the parties have failed to establish a sufficient denial of access. 927 F. Supp. at 1138; *see Gibson v. City of Chicago*, 910 F.2d 1510, 1523 (7th Cir. 1990) (finding that even where a plaintiff successfully alleges the filing of intentionally false and inaccurate reports, he cannot state a claim for denial of access to the courts without alleging some "concrete injury to the decedent's survivors resulting from th[e] alleged cover-up"); *Thompson v. Boggs*, 33 F.3d 847, 852-53 (7th Cir. 1994) (police officers who omitted information from police reports did not deny access to court, since facts known to plaintiff were sufficient to enable him to promptly file his lawsuit, unlike *Bell*, "where the true facts were concealed thereby denying the plaintiffs the opportunity to file a lawsuit until some twenty years after the fact"); *Vasquez v. Hernandez*, 60 F.3d 325, 329 (7th Cir. 1995) (holding that where the actual circumstances surrounding the

20

shooting were revealed publicly within six months of the incident, and plaintiffs were granted access to records of investigation of the incident/cover-up, their constitutional rights "were ultimately preserved"); *Bolden*, 1996 WL 66135, at *11 (finding that because plaintiff was aware of alleged cover-up when filing complaint, "he was hardly deceived into forgoing his legal remedies").

In *Hickenbottom*, the court similarly noted that more recent cases have limited the *Bell* holding to only the most egregious facts. 2007 WL 7753803, at *37; *see Foster v. City of Lake Jackson*, 28 F.3d 425, 430 (5th Cir. 1994) (suggesting that the right of access to the courts encompasses "a right to file an action, but not the right to proceed free of discovery abuses after filing"); *Estate of Smith v. Marasco*, 318 F.3d 497, 511–12 (3d Cir. 2003) ("[O]nly prefiling conduct that either prevents a plaintiff from filing suit or renders the plaintiff's access to the court ineffective or meaningless constitutes a constitutional violation."); *Kies v. City of Aurora*, 149 F. Supp. 2d 421, 424 (N.D. Ill. 2001) ("When there are no allegations indicating that a defendant's cover-up prevented a plaintiff from pursuing a tort action or that the value of such an action was reduced by the cover-up, there is no basis for a § 1983 action because there has been no injury beyond the underlying torts.").

Here, the injuries alleged by Plaintiff in her § 1983 conspiracy claim fail to establish that her claims against Defendants have been hindered or devalued to such an extent that her constitutional rights have been violated. (*See* ECF No. 1-1, Compl. ¶¶ 68–69.) Plaintiff filed her lawsuit two years after the alleged incident occurred, and there is no indication that the delay was due to any actions by Defendants. While Plaintiff

makes vague references to her inability to "discover the truth and to pursue adequate redress," she does not point to any specific obstruction to her case allegedly caused by Weatherford's conduct. (ECF No. 133 at 14.) The Complaint alleges that the conspiracy has prevented Plaintiff "from knowing the true circumstances and true culprits responsible for the death, harms and losses of the Plaintiff and Plaintiff's decedent," but the Court has found that fact-issues preclude summary judgment on Plaintiff's claims for excessive force and other causes of action against Weatherford. (*See* ECF No. 1-1 at 20, Compl. ¶ 69.) Thus, "this very opinion demonstrates that [Plaintiff] ha[s] been able to develop the facts in this case quite effectively." *Marasco*, 318 F.3d at 512 (finding alleged cover-up did not prevent plaintiffs "from filing suit or render their access to the courts ineffective or meaningless").

In short, the Court finds that Plaintiff cannot establish any constitutional violation from her purported denial of access to the courts and, therefore, grants summary judgment on her § 1983 civil conspiracy claim.

### ii.    Civil Conspiracy under State Law

Under South Carolina law, "[t]he tort of civil conspiracy has three elements: (1) a combination of two or more persons, (2) for the purpose of injuring the plaintiff, and (3) causing plaintiff special damage." *Hackworth v. Greywood at Hammett, LLC*, 682 S.E.2d 871, 874 (S.C. Ct. App. 2009) (citing *Vaught v. Waites*, 387 S.E.2d 91, 95 (S.C. Ct. App. 1989)).

Here, the Magistrate Judge found that "the footage from the chest-cam is enough evidence for Plaintiff to overcome Defendant Weatherford's summary judgment motion

concerning civil conspiracy." (ECF No. 116 at 32–33.) She explained that the officer's statements, when compared to the video evidence, created a question of fact as to whether Defendants engaged in some sort of civil conspiracy. (*Id.* at 33.) She further found that "[w]hether Plaintiff is able to establish the elements of this cause of action to a jury's satisfaction is not one for the court at this time." (*Id.*)

Weatherford's objection provides substantive arguments relating only to Plaintiff's § 1983 conspiracy claim. In arguing that Plaintiff has failed to establish a claim for "civil conspiracy," he recites the elements required to establish civil conspiracy under § 1983. (ECF No. 125 at 11 (citing *Hinkle v. City of Clarksburg, W.Va.*, 81 F.3d 416, 421 (4th Cir. 1996)).) Weatherford offers no basis to grant summary judgment on Plaintiff's civil conspiracy claim under state law and the Court has not independently found one. The Court agrees with the Magistrate Judge that the video evidence does not necessarily support Defendants' version of the events at issue. Accordingly, the Court finds a question of fact as to whether Defendants engaged in civil conspiracy and denies Weatherford's motion for summary judgment on the civil conspiracy claim under South Carolina law. Weatherford's objection is therefore overruled.

### 2.    Plaintiff's Objections

Plaintiff partially objects to Report One, arguing that the Magistrate Judge erred in finding that Weatherford is entitled to a qualified immunity defense on Plaintiff's § 1983 claim for Fourth Amendment knock-and-announce violations. (ECF No. 124 at 1.) Citing "key evidence" purportedly overlooked by the Magistrate Judge, Plaintiff asserts that no reasonable officer in Weatherford's position could have believed that Russell did not

have a legitimate expectation of privacy in the premises where the search warrant was executed. (*Id.* at 2.) Plaintiff further argues that the Magistrate Judge erred in her interpretation of the Fourth Circuit Court of Appeals case, *U.S. v. Gray*, 491 F.3d 138 (4th Cir. 2007), and in her application of the case to the present facts. (*Id.* at 9–12.)

Qualified immunity protects government officials performing discretionary functions from suits for civil damages arising out of the exercise of their discretionary functions, provided that their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The plaintiff's rights must be established so clearly that a "reasonable official would understand that what he is doing violates that right." *Slattery*, 939 F.2d at 216 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Accordingly, ruling on a defense of qualified immunity requires "(1) identification of the specific right allegedly violated; (2) determining whether at the time of the alleged violation the right was clearly established; and (3) if so, then determining whether a reasonable person in the [official's] position would have known that doing what he did would violate that right." *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992).

In addressing qualified immunity, the United States Supreme Court has held that "a court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne*, 526 U.S. 286, 290 (1999); *see also Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).

24

Further, the Supreme Court held that "[d]eciding the constitutional question before the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Wilson*, 526 U.S. at 609. If the court first determines that no right has been violated, the inquiry ends there, "because government officials cannot have known of a right that does not exist." *Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998).

As an initial matter, the Court notes the thorough and detailed manner in which the Magistrate Judge addressed Plaintiff's claim for Fourth Amendment knock-and-announce violations. After providing a detailed factual background, the Magistrate Judge skillfully summarized the parties' arguments and the applicable law. (ECF No. 116 at 2–6, 9–13.) She then thoroughly analyzed Plaintiff's Fourth Amendment claim, first finding that a question of fact remains concerning whether Russell had a legitimate expectation of privacy in the location where this shooting occurred, and then concluding that Defendants failed to comply with the knock and announce rule and no exception to this rule applied here.[4] (*Id.* at 13–24). The Magistrate Judge next determined, however, that because a reasonable officer armed with the information Defendant Weatherford possessed at the time of the search warrant's execution would have reason to believe it

---

[4] Weatherford did not file an objection to this aspect of the Magistrate Judge's finding and the Court finds her reasoning does not evidence clear error. *See Diamond*, 416 F.3d at 315 (holding de novo review unnecessary in the absence of a timely filed, specific objection). Specifically, the Magistrate Judge correctly found that the officers' conduct in failing to announce their presence and not waiting a reasonable amount of time before entering the building violated the knock-and-announce rule. (ECF No. 116 at 23); *see United States v. Grogins*, 163 F.3d 795, 797 (4th Cir. 1998) ("[T]he Fourth Amendment incorporates the common law requirement that police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry." (quoting *Richards v. Wisconsin*, 520 U.S. 385, 387 (1997))). She further correctly determined that Defendants could not establish any exemption from the rule based on exigent circumstances. (ECF No. 116 at 23); *see Grogins*, 163 F.3d at 797 ("In order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." (quoting *Richards*, 520 U.S. at 394)).

would be legal to dispense with the knock-and-announce requirement, Weatherford was entitled to qualified immunity on this Fourth Amendment claim. (*Id.* at 34–39.) On this point, she first found that a reasonable officer in Weatherford's position would have reason to believe the building was only an illegal gambling hall and not Russell's private residence. (*Id.* at 38.) Then, drawing upon the case law and the *Gray* decision in particular, the Magistrate Judge found that a person operating a "solely illegal" business in a commercial space would not have a legitimate expectation of privacy in that space. (*Id.* at 39.)

While Plaintiff expressly objects to only the qualified immunity portion of Report One, her arguments implicate the Magistrate Judge's reasoning and findings as to other aspects of the Fourth Amendment claim. Most significantly, Plaintiff has attached to her brief a lease agreement naming "Ernest Russell" as the lessee of the property at which the search warrant was executed, and argues that this document establishes that Russell had a legitimate expectation of privacy in the location where the warrant was executed.[5] (ECF Nos. 124 at 3–4; 124-3.) As explained by the Magistrate Judge, this finding is crucial because the "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." (ECF No. 116 at 15 (citing

---

[5] Plaintiff asserts that her counsel only just located the lease agreement and served a copy on Defendants as soon as it was discovered, on September 15, 2016, as part of Plaintiff's supplemental responses to Defendants' document requests. (ECF No. 124 at 3–4 n.1.) Given the relevance of the document, the Court, in its discretion, will admit the document into the record. *See Bennett v. Stirling*, No. CV 2:13-3191-RMG, 2016 WL 1070812, at *3 (D.S.C. Mar. 16, 2016) ("[T]he district court's decision whether to consider additional evidence is committed to its discretion, and any refusal will be reviewed for abuse.") (citation omitted).

*Bonner v. Anderson*, 81 F.3d 472, 475 (4th Cir. 1996) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143, (1978)).)

The lease agreement, dated March 1, 2005, provides a lease term starting March 1, 2005, with no end date. (ECF No. 124-3 ¶ 1.) The "use of premises" paragraph states that

> The premises shall be used and occupied by Lessee and Lessee's immediate family, consisting of <u>Ernest Russell ETC. Business</u>, exclusively, as a private single family dwelling, and no part of the Premises shall be used at any time during the term of this Agreement by Lessee for the purpose of carrying on any business, profession, or trade of any kind, or for any purpose other than as a private single family dwelling. Lessee shall not allow any other person, other than Lessee's immediate family or transient relatives and friends who are guests of Lessee, to use or occupy the Premises without first obtaining Lessor's written consent to such use.

(*Id.* ¶ 4.)

From this newly submitted piece of evidence, the Court concludes that Russell, at a minimum, had the right to exclude others from the property at issue, and that he also lawfully possessed and controlled that property as a tenant. *See Rakas*, 439 U.S. at 143 n.12 (explaining that a legitimate expectation of privacy means "the right to exclude others" and that "one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude"). While Plaintiff asserts that the lease terms establish the building was used as a "private single family dwelling," the Court is not convinced this is an established fact, given that Russell wrote the premises shall be used by "Ernest Russell ETC. *Business*." (emphasis added). However, such a finding is not necessary in order to conclude that Russell had a legitimate expectation of privacy in the building. The lease agreement establishes what

27

the Magistrate Judge found to be "an outstanding question of fact," (ECF No. 116 at 21), namely, that Russell lawfully possessed and controlled the property. Accordingly, the Court finds that Plaintiff has standing to assert Russell's Fourth Amendment rights.

Although the lease agreement establishes Russell's legitimate expectation of privacy in the building at issue, it does not necessarily resolve the question of qualified immunity. To determine whether Weatherford should be afforded qualified immunity for Plaintiff's Fourth Amendment claim, the Court must determine whether a reasonable officer *armed with the information Weatherford possessed at the time of the search warrant's execution* would have believed that his actions were lawful. *See Graham v. Gagnon*, No. 15-1521, 2016 WL 4011156, at *5 (4th Cir. July 27, 2016) (internal citations omitted) ("In determining what conduct of Graham's was known to the officers, we consider only information actually possessed by the officer[s] at the critical time, or that was then reasonably available to [them], and in light of any exigencies of time and circumstance that reasonably may have affected the officer[s'] perceptions."); *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994) ("Though [the test] focuses on the objective facts, the immunity inquiry must be filtered through the lens of the officer's perceptions at the time of the incident in question."). Plaintiff has not given any indication that Weatherford had knowledge of the lease agreement at the time of the incident and the Court finds no support for such a conclusion in the record.

However, Plaintiff does not rely solely on this newly discovered evidence to argue that Weatherford is not entitled to qualified immunity. She also asserts that that "[t]he background investigation would have led a reasonable officer in Officer Weatherford's

position to conclude he was approaching Mr. Russell's private premises and that Mr. Russell controlled access to the building." (ECF No. 124 at 7.) The "background investigation" Plaintiff refers to here was conducted by Sergeant Clyde Sheppard ("Sheppard") and included using a confidential informant and conducting surveillance of the building at issue. Sheppard testified that Weatherford "helped [him] do some surveillance." (ECF No. 124-7 at 7, Sheppard Dep. 22:20–22.)

According to Plaintiff, the investigation would necessarily have revealed the "domestic and personal items inside the building," including, *inter alia*, a "pool table," "pots/pans/food/drink mix," "television," "children's toys," "numerous family photos on the wall," and Russell's "child's school work." (ECF No. 124 at 6–7.) The Court has reviewed the photos of the building's interior submitted by Plaintiff and has observed the notated items. (ECF No. 124-2.) While the Court agrees that such items are consistent with items one could see in a person's home or private space, they are also consistent with items one could see in a person's business establishment. This is particularly true when considering the manner in which the items are displayed. For example, although the building contains a refrigerator, the photo indicates it was almost entirely filled with cans of Coca-Cola and other types of drinks. (*Id.* at 2.) Further, the photo of the bathroom indicates there is no shower or bathtub of any kind. (*Id.* at 3.) Finally, the children's toy referenced by Plaintiff is a toy police truck that appears to be discarded—it sits near two tires, a rag, and a cardboard box filled with unidentifiable items. (*Id.* at 4.)

The Court is not convinced that Weatherford's participation in the background investigation, even if such investigation did reveal the items mentioned by Plaintiff, would

have led a reasonable officer in Weatherford's position to conclude he was approaching Weatherford's private residential premises. Indeed, the Court finds that a reasonable officer could infer from the evidence revealed in the background investigation that the building was only used as an illegal gambling hall. The photos of the building's interior included in the record reveal at least four visible video gambling machines and do not indicate the operation of any legitimate business. (ECF No. 76-6 at 1.)

Plaintiff also cites the language in the search warrant as evidence that Weatherford believed Russell to have control of the building. (ECF No. 124 at 8.) She quotes the portion of the search warrant stating the warrant was to be delivered "to the person in charge of the premises searched' at the time of the search," and asserts that Weatherford must have believed Russell to be in charge given that only he and the confidential informant were in the building when the search warrant was executed. (ECF No. 124 at 8 (quoting 124-9 at 2).) However, Plaintiff conveniently omits the remaining portion of the sentence that he quotes. This portion of the search warrant states, in its entirety:

> A copy of this Search Warrant shall be delivered to the person in charge of the premises searched at the time of such search if practicable, and, if not, to such persona [sic] as soon thereafter as practicable; in the event the identity of the person in charge is not known or if such person cannot be found after reasonable diligence in attempting to locate the person, a copy shall be attached to a prominent place on such premises."

(ECF No. 124-9 at 2.) When read in its entirety, the search warrant does not necessarily suggest Weatherford believed Russell controlled the building. The search warrant expressly contemplates that if the person in charge is not on the premises at the time of the search, it can be delivered to the proper person "as soon thereafter as is practicable."

(*Id.*) Thus, even if Weatherford knew that only Russell and the confidential informant were inside the building at the time of the search, he could have intended to deliver the search warrant to the person he believed to be in charge of the building after the search was completed. The Court also notes here that the language of the search warrant further supports finding that Weatherford believed the building was solely used for an illegal gambling business. Under "description of property," the warrant states: "DCDEU monies, large amounts of U.S. currency, gaming machines, books records, receipts, notes, ledgers, electronic devices and other papers related to illegal gaming and gambling equipment." (*Id.*)

Upon a thorough review of the evidence, the Court concludes that the Magistrate Judge did not err in finding that a reasonable officer in Weatherford's position would have reason to believe the building was "only an illegal gambling hall" and was not Russell's private residence. (ECF No. 116 at 38.) Given this finding, the Court further agrees with the Magistrate Judge's conclusion that a reasonable officer in Weatherford's position would have reason to believe it would be legal to dispense with the knock-and-announce requirement.

As previously stated, the Magistrate Judge thoroughly analyzed the case law on the issue of when an individual has a legitimate expectation of privacy under the Fourth Amendment. She quoted *Gray* at length, including the court's holding that "[t]o be legitimate, an expectation of privacy must be objectively reasonable: it must flow from 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by

society.'" *Gray*, 491 F.3d at 145 (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)). Although Plaintiff argues otherwise, the Court finds that *Gray* supports the Magistrate Judge's findings as they relate to the qualified immunity issue.

In *Gray*, the defendant, Terrence A. Askew ("Askew"), moved to suppress evidence obtained from an allegedly unlawful search of the apartment of his co-defendant, Joshua Brent Gray ("Gray"). *Id.* at 142. To determine whether Askew possessed a legitimate expectation of privacy in Gray's residence, the court examined the relationship between Gray and Askew and discussed Askew's purpose for being at the apartment when it was searched. The court determined that Askew and Gray's "relationship was a commercial, rather than social, one," in which "Askew was selling drugs out of Gray's home." *Id.* at 146–147. It concluded that "because Askew's purpose at [the residence] was patently commercial, he had no legitimate expectation of privacy in Gray's residence." *Id.* at 154. While these facts admittedly differ somewhat from the present matter, the *Gray* court's general discussion of an individual's expectation of privacy in a nonresidential property is relevant and persuasive.

Specifically, the *Gray* court noted that

while expectations of privacy are at their apex in one's home, they diminish considerably in nonresidential property. An industrial complex does not, of course, "share the Fourth Amendment sanctity of the home." [*Kyllo v. U.S.*, 553 U.S. 27, 37 (2001)]. Rather, the "expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home." *Carter*, 525 U.S. at 90 (quoting *New York v. Burger*, 482 U.S. 691, 700 (1987)).

*Id.* at 145–146. The court later found that "those who venture forth to conduct illegal business often do not hold a legitimate expectation of privacy in locations that are not their own." *Id.* at 146.

Plaintiff contends that to the extent *Gray* is applicable, it supports her position because "the tenant in *Gray* successfully challenged the search and had illegally obtained evidence suppressed." (ECF No. 124 at 10.) While this is factually true, at the time of the search, Weatherford had no reason to know that Russell was a tenant of the building. Further, the tenant in *Gray* was successful in suppressing evidence obtained from a warrantless search. Here, there is no question that Weatherford had a search warrant and could lawfully enter the building. Accordingly, this aspect of *Gray* is not applicable here.

Plaintiff further argues that unlike Askew in *Gray*, Russell had a "far greater connection to the illegally searched premises." (ECF No. 124 at 11.) However, for reasons previously stated, the Court has determined that a reasonable officer in Weatherford's position would not have reason to believe the building was Russell's private residence. Thus, to the extent Plaintiff argues the "connection" in the present matter establishes a more social connection between Russell and the building than that in *Gray*, the Court has already found that it would be reasonable to believe the building was commercial in nature, solely used for illegal gambling activity.

Finally, Plaintiff argues that "the fact that Officer Weatherford suspected Russell of illegal activity on the premises cannot inevitably mean Mr. Russell lacked an expectation of privacy in the building." (ECF No. 124 at 12.) The Court agrees that if the property was

in fact Russell's residence or used for the purpose of legitimate business, the mere fact that illegal business was also being conducted would not necessarily negate any expectation of privacy, to the extent such an expectation existed. However, here, the Court has found that it would be reasonable for an officer in Weatherford's position to assume that the building was not Russell's residence and was used solely for illegal gambling. Accordingly, it would be reasonable for an officer in Weatherford's position to believe that, upon obtaining a search warrant, he could lawfully dispense with the knock and announce rule. In so finding, the Court limits this holding to facts of this particular case.

Notably, the limited authority Plaintiff cites on this issue is inapposite to this case. Specifically, Plaintiff cites *McDonald v. U.S.*, 335 U.S. 451, 453 (1948) and *U.S. v. Washington*, 573 F.3d 279, 283 (6th Cir. 2009) for the proposition that "[t]he Fourth Amendment's protection against illegal searches 'extends to the innocent and guilty alike.'" (ECF No. 124 at 11.) In *McDonald*, the court essentially by-passed the issue of whether the suspect had a legitimate expectation of privacy in the building searched, and instead focused its finding of a Fourth Amendment violation on the fact that the officers lacked a "compelling reason[] to justify the absence of a search warrant." 335 U.S. at 454–455 ("We cannot allow the constitutional barrier [of a search warrant] that protects the privacy of the individual to be hurdled so easily."). Here, Weatherford obtained a lawful search warrant prior to entering the building. In *Washington*, the court found that "[i]n light of the fact that [the suspect] had been *lawfully residing in the apartment* for several months, the notion that drug use or illegal activity eviscerates any right to

challenge a search cannot possibly be sustained." 573 F.3d at 283 (emphasis added). As stated practically ad nauseam, the Court has found that it would be reasonable for an officer in Weatherford's position to assume that the building was not Russell's residence. Thus, *McDonald* and *Washington* have no applicability to the present case.

In sum, the Court agrees with the Magistrate Judge's conclusion that Weatherford is entitled to qualified immunity of Plaintiff's claim for knock-and-announce violations under the Fourth Amendment. Accordingly, the Court grants summary judgment on this claim and overrules Plaintiff's objection.

### B.    Report Two

In Report Two, the Magistrate Judge recommended granting Defendants Wayne Byrd ("Byrd"), Darlington County Sherriff's Office, and the County of Darlington's motion for summary judgment and dismissing these Defendants. (ECF No. 118.) Before addressing Plaintiff's specific objection to this Report, the Court will first review for clear error the claims to which Plaintiff did not specifically object. *See Diamond*, 416 F.3d at 315 (holding *de novo* review unnecessary in the absence of a timely filed, specific objection).

The Magistrate Judge first found that Byrd should not be liable for a violation of the Fourth Amendment because "[u]ndisputed evidence indicates that any role [he] played in this investigation was supervisory in nature" and there was no evidence suggesting Byrd "had any participation" in the violation of Russell's constitutional rights. (ECF No. 118 at 9–10.) She therefore recommended granting summary judgment on Plaintiff's first cause of action for unlawful search, excessive force, and violation of due

35

process against Byrd. Because the Court cannot find any evidence in the record indicating that Byrd personally participated in the alleged violations of Russell's Fourth Amendment rights, summary judgment is proper here. *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (finding that in order for an individual to be liable under § 1983, it must be affirmatively shown that the "official charged acted personally in the deprivation of the plaintiff's rights"); *Bennett v. Georgetown Cty. Det.*, No. C.A. 2:10-0762, 2010 WL 5866595, at *4 (D.S.C. Nov. 4, 2010), *report and recommendation adopted*, 2011 WL 723131 (D.S.C. Feb. 23, 2011) (dismissing the plaintiff's claims where plaintiff failed to establish "any personal involvement in a tort of constitutional magnitude on the part of any defendant").

The Magistrate Judge next found that Plaintiff failed to establish a § 1983 claim for deliberate indifference against Byrd, Darlington County Sherriff's Office, and the County of Darlington. She analyzed Plaintiff's claim in detail, ultimately finding that: (1) Plaintiff could not recover here under the theory of vicarious liability because "§ 1983 does not recognize vicarious liability through the doctrine of *respondeat superior*"; (2) Plaintiff failed put forth sufficient evidence to establish a claim for supervisory liability; and (3) Plaintiff failed to establish a claim for municipal liability because she did not put forth evidence demonstrating "the existence of a policy or a policy maker's knowledge of a deficient policy." (ECF No. 118 at 10–16.)

The Magistrate Judge is correct that vicarious liability does not apply in § 1983 suits. *See Vinnedge*, 550 F.2d at 928 ("The doctrine of *respondeat superior* has no application under [§ 1983]."). The Court further agrees with the Magistrate Judge's

finding that Plaintiff has failed to put forth evidence that would satisfy any of the three elements necessary to establish supervisory liability. *See Shaw v. Stroud*, 13 F.3d 791, 801 (4th Cir. 1994) (to establish supervisory liability under § 1983, a plaintiff must establish that: "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff"). Finally, the Court agrees with the Magistrate Judge's finding that Plaintiff has failed to produce any evidence that "the Sheriff's Department or County maintained a custom or usage of a policy or condoned a practice that was allegedly unconstitutional." (ECF No. 118 at 16.) Thus, Plaintiff's claim for municipal liability against these Defendants cannot survive summary judgment. *See Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987) ("Municipal fault for allowing [] a developed 'custom or usage' to continue requires (1) actual or constructive knowledge of its existence by responsible policymakers, and (2) their failure, as a matter of specific intent or deliberate indifference, thereafter to correct or stop the practices.").

The Magistrate Judge next correctly found that Byrd is entitled to qualified immunity from any monetary relief claims brought against him in his individual capacity. (ECF No. 118 at 16.) As previously stated, Plaintiff has failed to establish that Byrd violated any of Russell's constitutional rights—he is therefore entitled to qualified

immunity on Plaintiff's § 1983 claims. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (finding qualified immunity appropriate where a defendant's conduct does not violate a clearly established constitutional right or the constitutional rights of which a reasonable person would have known). The Magistrate Judge further correctly found that Byrd is entitled to Eleventh Amendment immunity as an arm of the State. (ECF No. 118 at 18); *see McCall v. Williams*, 52 F. Supp. 2d 611, 615 (D.S.C. 1999) ("As an arm of the State, a deputy sheriff is entitled to Eleventh Amendment immunity from civil damages suits in federal court, unless the State expressly waived this immunity." (citations omitted)).

The Magistrate Judge next correctly found that Plaintiff's state law causes of action are barred by the South Carolina Tort Claims Act ("SCTCA"). After correctly noting the applicability of the SCTCA to Plaintiff's state tort claims, she found that certain language in the statute rendered Defendants immune from suit. Specifically, S.C. Code Ann. § 15-78-60(4) indicates that a governmental entity is not liable for a loss resulting from "adoption, enforcement, or compliance with any law or failure to adopt or enforce any law, whether valid or invalid, including, but not limited to, any charter, provision, ordinance, resolution, rule, regulation, or written policies." In addition, S.C. Code Ann. § 15-78-60(5) indicates that a governmental entity is not liable for loss resulting from "the exercise of discretion or judgment by the governmental entity or employee or the performance or failure to perform any act or service which is in the discretion or judgment of the governmental entity or employee."

The Magistrate Judge next found that Plaintiff's claim for civil conspiracy under State law could not survive summary judgment because she "failed to allege enough

38

facts against these Defendants that if true could amount to a claim for civil conspiracy." (ECF No. 118 at 21.) The Court agrees. As the Magistrate Judge noted, there is no allegation that any of the moving Defendants here gave a false statement. Nor is there any evidence demonstrating their participation in a conspiracy. Accordingly, summary judgment is appropriate here.[6]

Finally, the Magistrate Judge found that Plaintiff could not establish a claim for negligence or gross negligence against these Defendants. She found that Plaintiff alleged a "supervisory-like claim" here and found that Plaintiff failed to offer any evidence demonstrating that these Defendants had "reason and opportunity to control Defendant Weatherford or another officer." (ECF No. 118 at 23–24.) The Court agrees that Plaintiff has failed to establish a claim for supervisory negligence on the part of these Defendants—there is no evidence indicating that these Defendants were put on notice that one of the officers participating in the investigation or warrant execution created an undue risk of harm to the public. *See, e.g.*, *Bank of New York v. Sumter Cty.*, 691 S.E.2d 473, 478 (S.C. 2010) (affirming summary judgment where there was no evidence that the South Carolina Judicial Department knew or should have known employees posed an "undue risk of harm to the public"). Accordingly, summary judgment is appropriate here.

### 1.    Plaintiff's Objections

Plaintiff partially objects to Report Two, arguing that the Magistrate Judge erred in finding that Defendants Wayne Byrd and Darlington County Sheriff's Office ("Employing Defendants") are entitled to summary judgment on Plaintiff's claim for negligence and

---

[6] The Court also notes here that Plaintiff's § 1983 conspiracy claim fails against these Defendants for the same reasons as that given in the Court's discussion of the claim in Report One.

gross negligence under the SCTCA. (ECF No. 126 at 1.) Plaintiff contends that in analyzing this claim, the Magistrate Judge ignored Weatherford's alleged negligent and grossly negligent conduct and focused only on the allegations of negligent policymaking and training. (*Id.* at 2.) She contends that under S.C. Code Ann. § 15-78-70, Employing Defendants are "responsible for all negligent or grossly negligent acts Officer Weatherford committed in the moments before Mr. Russell's death." (*Id.* at 3.)

Plaintiff is correct in that the South Carolina Tort Claims Act (SCTCA) waives the sovereign immunity of state agencies and entities for the purpose of allowing tort claims against those entities based on the actions of their employees. The statute covers employee conduct insofar as it is not "outside the scope of his official duties or which constitutes actual fraud, actual malice, intent to harm, or a crime involving moral turpitude." S.C. Code Ann. § 15-78-60(17). However, South Carolina law also allows a cause of action based on the negligence of state agencies and entities in their hiring, supervision, or training of an employee. *James v. Kelly Trucking Co.*, 661 S.E.2d 329, 330 (S.C. 2008) ("[A] plaintiff may claim that the employer was itself negligent in hiring, supervising, or training the employee, or that the employer acted negligently in entrusting its employee with a tool that created an unreasonable risk of harm to the public.").

The Magistrate Judge interpreted the Complaint as alleging the latter type of claim, finding that "Plaintiff couches a supervisory-like claim against Defendant Byrd, Defendant Darlington County Sheriff's Office, and Defendant Darlington County." (ECF No. 118 at 22.) To make this finding, the Magistrate Judge quoted the allegations made in the Complaint under this cause of action. (*Id.*) For example, Plaintiff alleges, *inter alia*,

that Defendants "departed from the *duties of care* required by law enforcement officers and the agencies that *hire, train and employ* these officers and were thereby negligent, careless, grossly negligent, reckless and acted in violation of the duties owed to Ernest Russell . . ." (*Id.*, ECF No. 1-1 ¶ 65 (emphasis added)). The Magistrate Judge then correctly applied the four-part test outlined by the South Carolina Supreme Court to determine whether an employer may be liable for negligent supervision if an employee intentionally harms another. (ECF No. 118 at 23 (citing *Degenhart v. Knights of Columbus*, 420 S.E.2d 495, 496 (S.C. 1992)).)

Although Plaintiff now contends that this cause of action also alleges negligent and grossly negligent conduct by Weatherford, the Court finds no support for this assertion in the Complaint or elsewhere in the record. The parties' briefs before the Magistrate Judge do not give any indication that Plaintiff intended this type of claim. As pleaded, the claim clearly alleges supervisory-type negligence. There are no vicarious liability allegations present under this cause of action—rather, the Complaint alleges only that Defendant Byrd, Defendant Darlington County Sheriff's Office, and Defendant Darlington County breached their duties of care. (ECF No. 1-1 ¶ 65.)

The Magistrate Judge correctly found there was no evidence to support a claim for negligent supervision and Plaintiff expressly states that she does not object to this finding. (ECF No. 118 at 26; 126 at 2.) Because the Court finds no basis to construe the allegations under this cause of action beyond the scope discussed by the Magistrate Judge, summary judgment is appropriate on this claim. Plaintiff's objection is overruled.

41

C.    **Report Three**

In Report Three, the Magistrate Judge recommends granting Defendants City of Darlington, Darlington Police Department, and Clyde M. Sheppard's ("Sheppard") motion for summary judgment and dismissing these Defendants. (ECF No. 119.) Plaintiff has not filed any objections to this Report. The Court therefore reviews the Magistrate Judge's findings for clear error. *See Diamond*, 416 F.3d at 315.

The Magistrate Judge first found that Plaintiff could not sustain any § 1983 claims against Sheppard under a theory of bystander liability. (ECF No. 119 at 12.) She correctly found that such a theory failed because there was no evidence indicating Sheppard knew that fellow officers were violating Russell's constitutional rights. *See Randall v. Prince George's Cty., Md.*, 302 F.3d 188, 204 (4th Cir. 2002) ("[A]n officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.").

She next correctly found that Plaintiff's § 1983 claims against Defendants City of Darlington, Darlington Police Department, and Sheppard could not survive to the extent they were based on the doctrines of vicarious liability and *respondeat superior*. (ECF No. 119 at 12); *see Vinnedge*, 550 F.2d at 928 ("The doctrine of *respondeat superior* has no application under [§ 1983]."). She further correctly found that Plaintiff did not bring a § 1983 cause of action for supervisory liability against these Defendants, but rather, appeared to allege a supervisory claim against City of Darlington and Darlington Police Department in her third cause of action for negligence and gross negligence under South

Carolina common law. (ECF No. 119 at 13–14.) Similar to her analysis of this claim in Report Two, the Magistrate Judge found that Plaintiff failed to offer any evidence indicating that these Defendants were put on notice that one of the officers participating in the investigation or warrant execution created an undue risk of harm to the public. *See, e.g.*, *Bank of New York v. Sumter Cty.*, 691 S.E.2d 473, 478 (S.C. 2010) (affirming summary judgment where there was no evidence that the South Carolina Judicial Department knew or should have known employees posed an "undue risk of harm to the public"). She correctly found that this lack of evidence rendered summary judgment proper on Plaintiff's "purported causes of action for negligent supervision and negligent training." (ECF No. 119 at 18.)

The Magistrate Judge next found that Defendants were agents or employees of the State of South Carolina when acting in their official capacity. She determined that Defendants, in their official capacities, are immune from suit under the Eleventh Amendment. The Court is not convinced that a city's police department is necessarily entitled to Eleventh Amendment protection. *Compare Mickle v. Ahmed*, 444 F. Supp. 2d 601, 612 (D.S.C. 2006) ("A municipal police officer does not qualify for Eleventh Amendment immunity."); *Nelson v. Strawn*, 897 F. Supp. 252, 258 (D.S.C. 1995) (holding that the Moncks Corner Police Department, and its officers acting in their official capacities, are not shielded from suit by the Eleventh Amendment) (vacated on other grounds); *with Dixon v. Baltimore City Police Dep't*, 345 F. Supp. 2d 512, 513 (D. Md. 2003) (dismissing the plaintiff's complaint against the Baltimore City Police Department because the police department was a state agency and Maryland had not waived its

Eleventh Amendment immunity to suit in federal court). However, Plaintiff did not respond to this point in her opposition to Defendants' motion for summary judgment, nor in her objections. Accordingly, the Court finds Plaintiff has conceded this point. Also, as demonstrated in this Order, the Court finds that Plaintiff's federal claims fail against these Defendants regardless of any alleged immunity under the Eleventh Amendment.

Next, based upon her previous findings that Plaintiff failed to establish that Defendants' conduct could have violated Russell's constitutional rights, the Magistrate Judge correctly concluded that these Defendants were entitled to qualified immunity on the alleged constitutional violations. (ECF No. 118 at 16.) *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (finding qualified immunity appropriate where a defendant's conduct does not violate a clearly established constitutional right or the constitutional rights of which a reasonable person would have known).

Turning to Plaintiff's State claims, the Magistrate Judge correctly found that these causes of action are barred by the SCTCA. After noting the applicability of the SCTCA to Plaintiff's state tort claims, she correctly found that certain language in the statute rendered Defendants immune from suit. Specifically, S.C. Code Ann. § 15-78-60(5) indicates that a governmental entity is not liable for loss resulting from "the exercise of discretion or judgment by the governmental entity or employee or the performance or failure to perform any act or service which is in the discretion or judgment of the governmental entity or employee."

Based on the foregoing, the Magistrate Judge correctly recommended that Defendants City of Darlington, Darlington Police Department, and Clyde M. Sheppard's

motion for summary judgment be granted and these Defendants be dismissed as parties to this action.

## CONCLUSION

After careful consideration of the relevant motions, responses, and objections, the Court adopts Reports Two and Three and adopts Report One in part. It is, therefore, ORDERED that Defendant Weatherford's Motion for Summary Judgment (ECF No. 59) is GRANTED IN PART and DENIED IN PART. The Court denies Weatherford summary judgment on Plaintiff's § 1983 excessive force claim and State claims for wrongful death, survivorship, and civil conspiracy, and grants Weatherford summary judgment on Plaintiff's claim for Fourth Amendment knock-and-announce violations and civil conspiracy under § 1983. It is further ORDERED that Defendants Wayne Byrd, Darlington County Sheriff's Office, and County of Darlington's Motion for Summary Judgment (ECF No. 64) is GRANTED—these parties are therefore dismissed from this action. Likewise, it is ORDERED that City of Darlington, Darlington Police Department, and Clyde M. Sheppard's Motion for Summary Judgment (ECF No. 63) is GRANTED— these parties are therefore also dismissed from this action. Accordingly, only Plaintiff's claims against Weatherford survive. Specifically, her § 1983 claim for excessive force, as well as her State claims for civil conspiracy, wrongful death and survivorship.

**IT IS SO ORDERED.**

/s/Bruce Howe Hendricks
United States District Judge

Greenville, South Carolina
September 30, 2016

45